### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: SUPERCOM, INC., et al., | 15 Civ. 9650 (PGG) |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Arthur Seiden, on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to his own acts and upon information and belief as to all other matters based on the investigation conducted by Lead Counsel, which included a review of, *inter alia,* SEC filings by SuperCom Ltd. ("SuperCom" or the "Company"), press releases and other public statements by Defendants, media and analyst reports and advisories about the Company, interviews with confidential witnesses, and other public information. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons other than Defendants who purchased SuperCom common stock between January 21, 2015 and November 27, 2015, inclusive (the "Class Period"), seeking remedies against SuperCom and certain senior officers and/or directions under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      SuperCom provides traditional and digital identity solutions to governments and private and public organizations worldwide. The Company was founded in 1988 and its stock began trading on the NASDAQ Capital Market ("NASDAQ") in August 2007.

3.      On January 21, 2015, SuperCom announced a bold revenue and earnings projection: that "it anticipates **revenue growth** for the full year ended December 31, 2015 **to exceed 40% on a year-over-year basis** and anticipates non-GAAP EPS for the 2015 **to exceed $1.20 per share**."

4.      SuperCom had no basis for such an aggressive projection. Nevertheless, Defendants reiterated this guidance throughout almost all of 2015, while continuing to insist that it was not dependent upon any new contract wins—even as they became increasingly aware of undisclosed facts indicating otherwise. Meanwhile, they also made other misrepresentations about the Company's revenue streams and sales pipeline in order to prevent investors from learning the truth.

5.      The Company first reiterated this guidance on March 26, 2015 when it reported its 2014 financial results and claimed to be on track for revenue in 2015 "to exceed . . . $41.6 million" and for "non-GAAP EPS in 2015 to exceed $1.20 per share."

6.      The Company reiterated this guidance again on June 1, 2015 when it reported financial results for the first quarter of 2015. Defendant Arie Trabelsi (quoted in the release) touted the Company's "strong year-over-year revenue and earnings growth" and stated that the Company was "**increasingly excited about [its] pipeline of opportunities**," which "**continued to grow as [SuperCom]**

***advanced a number of important tenders during the quarter.***" As a result, the Company was on track to achieve its previously-issued guidance for revenue in 2015 "to exceed . . . $41.6 million" and "non-GAAP EPS in 2015 to exceed $1.20 per share."

7.      As intended, the market price of SuperCom shares surged on these statements, closing up approximately 12% at $12.09 on June 1, 2015 on unusually high trading volume.

8.      The Company reiterated this guidance again on September 16, 2015 when it reported its financial results for the second quarter of 2015. The Company reported only $15.4 million in revenue for the first six months of 2015—only a 25% increase over the first six months of 2014—because it had been forced to "recognize[] nearly $2 million of high-margin revenues that [it] expected to recognize in late June, during the first weeks of July, shortly after the quarter closed."

9.      Trying to mitigate the price decline that would otherwise have resulted, Defendant Arie Trabelsi stated that SuperCom again "executed according to plan in the second quarter, achieving revenue growth and strong margins ***while dramatically broadening [its] new business pipeline and solution offerings in [its] fast growing target markets***" and "executed on a number of strategic and operational initiatives including securing more than $7 million in follow on orders from existing e-ID customers [and] winning a highly strategic electronic offender monitoring tender with a new European government customer."

10.      Defendant Arie Trabelsi further emphasized that "***[t]he number, quality, stage and size of opportunities in [SuperCom's] pipeline [was]***

*increasingly encouraging*," that, "[b]ased on the **number of open proposals** [the Company had] around the globe in various stages and in light of [its] strengthened balance sheet following the successful offering, [the Company was] **well positioned to win additional new contracts this year**," and that "[w]ith a **growing base of recurring revenues** and increasing demand for [SuperCom's] solutions," **the Company would "meet the guidance previously issued**."

11.     Because of these statements, SuperCom's share price remained artificially inflated, declining only moderately.

12.     Things took a negative turn after the company received a letter from the Securities and Exchange Commission on September 30, 2015, requesting broader and more transparent explanations of changes to sources of reported revenue in the future.

13.     On November 17, 2015, instead of announcing its financial results for the third quarter of 2015, the Company suddenly reported that its "Acting" Chief Financial Officer, Simona Green, was "departing" without a replacement, and that SuperCom was also bringing in a new Chief Information Officer.

14.     On November 30, 2015, SuperCom finally disclosed "preliminary" results for the third quarter of 2015. Revenue for the quarter was "anticipated to be in a range of $5.5 million to $6.1 million"—**less than half of the $13.38 million the Company had led the investment community to expect.**

15.     Moreover, the Company finally admitted that it could not meet its 2015 revenue and earnings guidance. As recently as September 16, 2015, Defendants had

insisted that the Company was on track for $42 million of revenue. But now—*only a month before the end of the year*—the Company announced that it expected *only $30 million* in revenue for the year.

16.     The Company blamed the miss on a purported "inability to recognize more than $10 million of revenues that were expected this year." But after being pressed by analysts, it disclosed that the expected $10 million was from a contract that *had not even been signed yet* and was *not expected to be signed for six months*.

17.     An article on *Seeking Alpha* described the conference call as follows:

> With regard to the substantial revenue miss for the quarter it needed several analyst questions during the Q&A session until the acting CFO came out with an alleged $10 mln contract that so far had not been disclosed by the company but obviously was planned to contribute material revenues during Q3. Later in the call it turned out that this contract has yet TO BE SIGNED by the customer so *the question remains why the company built its revenue forecast on contracts that not even exist until today*. It is one thing to experience revenue recognition delays due to accounting provisions but it seems quite odd to put the blame on a contract that hasn't even been signed yet.[1]

18.     On this news, the price of SuperCom common stock plummeted by more than $3, or 40% from its close of $7.70 on November 27, 2015, closing at $4.60 on November 30, 2015 on unusually heavy trading volume of more than 3.3 million shares traded, approximately 20 times the average daily trading volume during the preceding ten trading sessions.

---

[1] H. Alex, *SuperCom Just Delivered On (My) Expectations—Now What?* Dec. 15, 2015, http://seekingalpha.com/article/3723856-supercom-just-delivered-expectations-now.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter under 28 U.S.C. §1331 and §27 of the Exchange Act.

20.     Venue is proper in this District under §27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the false and misleading statements alleged herein were disseminated from this District. SuperCom's U.S. headquarters are located in this District and SuperCom's common stock traded on the NASDAQ in this District throughout the Class Period.

21.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

22.     Lead Plaintiff Arthur Seiden purchased SuperCom common stock during the Class Period and was damaged thereby.

23.     Defendant SuperCom is a global provider of traditional and digital identity solutions, providing advanced safety, identification, tracking and security products to governments and private and public organizations. The Company is based in Herzliya Pituach, Israel, with its U.S. operating subsidiary SuperCom Inc. headquartered in New York. Following its ordinary share offering on June 18, 2015, the Company had more than 16 million shares issued and outstanding, some of

which trade on the NASDAQ under the ticker symbol "SPCB." Its common stock also trades on certain European stock exchanges.

24.    Defendant Arie Trabelsi has served at all relevant times as the President and CEO of SuperCom, having joined the Company in that capacity in November 2010.

25.    Defendant Tsviya Trabelsi has served at all relevant times as the Chairperson of the SuperCom Board of Directors, having joined the Company in that capacity in July 2010. She is also Defendant Arie Trabelsi's wife.

26.    Defendant Ordan Trabelsi has served at all relevant times as the President of SuperCom of the Americas, having joined the Company in that capacity in June 2013. He is also Defendant Arie Trabelsi's son.

27.    Defendant Barak Trabelsi has served at all relevant times as Vice President of SuperCom's M2M Division, having joined the Company in that capacity in January 2013. He is also Defendant Arie Trabelsi's son.

28.    Defendant Simona Green served as acting CFO of SuperCom from August 2014 until her resignation was announced on November 17, 2015.

29.    Defendants Arie Trabelsi, Tsviya Trabelsi, Ordan Trabelsi, Barak Trabelsi and Simona Green are referred to herein as the "Individual Defendants." SuperCom and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

30.     Defendant SuperCom provides electronic monitoring, identification, and security products and solutions to governments and commercial customers, principally in Africa, Eastern Europe, and South America.

31.     The Company's core business is the design and development of electronic identity ("EID" or "SmartID") solutions for governments, including national identification registries, biometric passports and visas, automated fingerprint identification systems, digitized driver's licenses, and voter registration systems.

32.     The Company also provides electronic tracking solutions for government and commercial clients, primarily in three verticals: electronic monitoring of prisoners under house arrest; tracking farm animals; and the healthcare and homecare markets. These solutions are now branded "PureConnect," but were previously also known as active radio frequency identification ("RFID") solutions.

33.     More recently, the Company has begun offering mobile payment solutions under the "SuperPay" brand. It has also acquired companies providing solutions in areas such as cybersecurity.

34.     The following table presents selected audited annual consolidated financial data about the Company, as presented in SuperCom's annual report for 2015, filed on Form 20-F on May 16, 2016 ("2015 20-F"):

|  | Year ended December 31, | | | |
|---|---|---|---|---|
|  | **2012** | **2013** | **2014** | **2015** |
| **Revenues** | $8,940,000 | $8,822,000 | $29,703,000 | $28,340,000 |
| **Gross Profit** | $7,321,000 | $6,926,000 | $22,402,000 | $17,894,000 |
| **Operating Income** | $2,006,000 | $1,514,000 | $8,009,000 | $1,493,000 |

35.     The following table presents selected unaudited quarterly financial data

for 2014, as reported by the Company in Forms 6-K filed with the SEC:

|  | **2014 Q1** | **2014 Q2** | **2014 Q3** | **2014 Q4** |
|---|---|---|---|---|
| **Revenue** | $5,308,000 | $7,056,000 | $9,104,000 | $8,235,000 |
| **Gross Profit** | $4,285,000 | $5,383,000 | $6,912,000 | $5,822,000 |
| **GAAP Operating Income** | $1,360,000 | $2,190,000 | $3,735,000 | $724,000 |
| **Non-GAAP Operating Income** | $1,755,000 | $2,731,000 | $4,130,000 | $2,138,000 |
| **Earnings Before Interest, Tax, Depreciation, and Amortization ("EBITDA")** | $1,768,000 | $2,746,000 | $4,163,000 | $2,337,000 |
| **Non-GAAP Earnings Per Share ("Non-GAAP EPS")** | $0.13 | $0.20 | $0.30 | $0.17 |

36.     The following table presents selected unaudited quarterly financial data for 2015 and the first quarter of 2016, as reported by the Company in Forms 6-K filed with the SEC:

|  | 2015 Q1 | 2015 Q2 | 2015 Q3 | 2015 Q4 | 2016 Q1 |
|---|---|---|---|---|---|
| **Revenue** | $7,700,000 | $7,744,000 | $5,723,000 | $8,343,000 | $5,867,000 |
| **Gross Profit** | $5,398,000 | $4,930,000 | $3,189,000 | $4,157,000 | $864,000 |
| **GAAP Operating Income** | $2,604,000 | $1,285,000 | $720,000 | ($422,000) | ($1,246,000) |
| **Non-GAAP Operating Income** | $3,098,000 | $2,305,000 | $1,036,000 | $1,097,000 | ($1,169,000) |
| **EBITDA** | $3,114,000 | $2,396,000 | $1,101,000 | $1,316,000 | ($950,000) |
| **Non-GAAP EPS** | $0.23 | $0.16 | $0.06 | $0.06 | $0.01 |

## The Company's History

37.     The Company was incorporated in Israel in 1988 as a development-stage company focused on the governmental market. In 1999, it began producing traditional and digital IDs for the commercial market, and its stock began trading publicly on the NASDAQ Europe stock market. In 2004, it became a foreign private issuer reporting company in the United States and its stock began trading in the U.S. on the OTC Bulletin Board.

38.     In 2007, the Company sold its EID division to On Track Innovations Ltd. ("OTI"), changed its name to Vuance Ltd., and shifted its focus to the sale of RFID products in the United States. On August 23, 2007, its ordinary shares began trading on the NASDAQ Capital Market under the symbol "VUNC."

39.     This shift was not successful. In 2008, the Company had an operating loss of $3 million and a net loss of $12.4 million on $18.1 million in revenue. In 2009, it lost another $5.1 million on $9.3 million in revenue. The Company's securities were also delisted from NASDAQ on October 1, 2009 because of inadequate stockholders' equity, and they began trading on the OTC market.

40.     In 2010, SigmaWave, a family-owned private-equity fund based in Israel, acquired control of around 45% of outstanding shares and took over the Company, staving off an otherwise imminent bankruptcy. Defendant Tsviya Trabelsi was appointed Chairman of the Board and her husband Defendant Arie Trabelsi was named CEO.

41.     The new management took the Company in a new direction.

42.     In a press release on March 14, 2013, the Company announced that it had changed its name back to SuperCom as part of a "new investor relations program designed to increase following from international investors and transparency to the financial markets" and to requalify for NASDAQ. The press release quoted SuperCom CEO Arie Trabelsi saying the following:

> I am proud to re-launch the new SuperCom. The year 2012 was a fantastic turnaround year for us . . . . As we move through 2013, and we begin to increasingly realize our potential, we have upgraded our outreach and investor relation activities. Our aim is to better realize the true value of our company by increasing our transparency and communication levels with our existing shareholders and new investors.

43.     On August 14, 2013, the Company announced that it had "signed a definitive agreement . . . to acquire OTI's SmartID division," elaborating:

Following a successful conclusion of a due-diligence process, SuperCom will pay $10 million, with an earn-out mechanism of up to a further $12.5 million subject to various performance criteria and milestones.

The acquired SmartID division has a strong presence throughout the world, with a broad range of competitive and well-known EID solutions, and technology.

In 2011 and 2012, the acquired division's average annual revenue was approximately $20 million. On a pro-forma basis, ***the merger of the acquired division with SuperCom triples SuperCom's annual revenue*** and is expected to be highly accretive to SuperCom's financial results.

44.     The Company's stock began trading on NASDAQ on Tuesday, September 17, 2013 under the ticker symbol "SPCB."

45.     Analysts were excited about the new acquisition. For example, Irit Jakoby wrote on *Seeking Alpha* that the deal would greatly improve SuperCom's chances at winning contracts, and "even just one win per year makes a major difference to SuperCom" because "***[e]ach new EID deal won, can add tens of millions of dollars in recurring revenue per year***."[2]

46.     In December 2013, the Company raised $13.8 million through a secondary public offering and used the funds to re-acquire its EID division from OTI.

47.     The Company announced the acquisition in a December 26, 2013 press release, in pertinent part as follows:

---

[2] I. Jakoby, *SuperCom's Acquisition Of OTI's SmartID Division Appears Highly Accretive***,** Sep. 18, 2013, http://seekingalpha.com/article/1700592-supercoms-acquisition-of-otis-smartid-division-appears-highly-accretive.

**SuperCom Completes Smart ID Acquisition**

Forming a company with a combined 2012 pro-forma revenue of $26.2M and EPS of $0.88

HERZLIYA, Israel, December 26, 2013—SuperCom Ltd (NASDAQ: SPCB), a leading provider of Electronic Intelligence solutions for National ID, Public Safety and HealthCare, today announced that it has completed the acquisition of the Smart ID division from On Track Innovations (NASDAQ: OTIV).

\* \* \* \*

Post-acquisition, SuperCom demonstrates:

- Combined pro-forma revenues for the full year 2012 of $26.2 million, with an EPS* of $0.88; for the first six months of 2013, EPS was $0.45;

- ***A rich and extensive pipeline of over 50 bids, proposals and opportunities in over 25 countries, with a total potential revenue of over $500 million to be implemented over the next 5 years;***

- An applicable and addressable market of 2 billion per year.

**Continued [Defendant Arie] Trabelsi,** "***Our new SmartID division strongly boosts our contract base and pipeline***. It also vastly expands the breadth of our EID capabilities globally and ***significantly increases our potential for revenue growth***, while removing a tough competitor.

### <u>The December 2013 Interview</u>

48.    Defendants wasted no time before touting what the acquisition could mean for the Company.

49.    On December 30, 2013, Lazarus Management Company, a SuperCom shareholder, published an article on *Seeking Alpha* titled "SuperCom CEO: We Just

Tripled Our Revenues And We're Only Getting Started," featuring an interview with SuperCom CEO Arie Trabelsi and Vice President of US Operations Ordan Trabelsi.[3]

50.     That article and interview illustrate SuperCom's core sales pitch to investors.

51.     In that interview, SuperCom CEO Arie Trabelsi stated:

> Moreover, **we are inheriting a huge pipeline of bids around the world** and, as some of you might know, the bidding process in the EID space is very long term. It can take two to three years to win a contract. But, **once you win these contracts, you have a very long term base of revenues**. So we're inheriting a **pipeline with bids in over 20 countries around the world and many of them are close to maturity and we expect to see a number of these awards be given out in 2014**, which has potential to increase our revenues significantly going forward.

52.     SuperCom Vice President of US Operations Ordan Trabelsi stated:

> It takes a long time to win a contract in a government, but, once you do that, you enter their infrastructure. You usually deploy a full production line within a government: the printers, the materials, the software, the databases, and the readers. And since it is core to the operations of a government and it takes a while to install it and it also takes a very long and expensive process to remove it, **once you are installed in a government, you have very long term recurring revenues. We've seen one of our contracts supply us with nearly two decades of growing revenues; it keeps on being renewed**.

---

[3] Lazarus Mgmt. Co., *SuperCom CEO: We Just Tripled Our Revenues And We're Only Getting Started* Dec. 30, 2013, http://seekingalpha.com/article/1920821-supercom-ceo-we-just-tripled-our-revenues-and-were-only-getting-started.

53.     The interviewer, noting that "it sounds like much of future growth is dependent upon winning new contracts," asked about "the pipeline for the next 12 months." Defendant Arie Trabelsi responded:

> I think the important thing here is that **on one side we have contracts which continue to generate revenue on a recurring basis**. On the other hand, we have a pipeline of bids in different stages. **Some of them are very close to the point of award**. Some are in the early stages. Others are in the middle. We believe that, right now, we're in an excellent position in terms of our pipeline.
>
> In EID, what we have, both from OTI and SuperCom, enables us to potentially see a nice stream of contract awards implemented over the next seven years. **We are talking about a wide range of proposals, opportunities or bids that can range from $5 million up to $150 million**. When you take them and you put each one on a timeline, you see that you can fill out seven years of revenue just from the award of some of them. If we estimate a win rate of 10% to 15% of those opportunities, I believe we're going to be in excellent position in comparison to the combined OTI and SuperCom revenue for the year 2012. And I do believe that, if we can make the most of having both companies combined together, that a win rate of over 10% is very, very achievable.

54.     Asked "how many contracts you have an open bid on," Defendant Arie Trabelsi responded:

> I don't know if I can disclose numbers. I could just say that **it's well-known that in the market there are at least, I think, 30 opportunities every year**. Now, we don't bid on all of them because we concentrate on the ones where we have a competitive advantage, for instance with our technology. **We have over 50 of open proposals and bids in more than 20 countries and our goal is to secure at least three contracts every year.**

55.     Defendant Arie Trabelsi later emphasized just how transformative a single contract could be:

> In the EID market we talk about **contracts that, in many cases, can be 3-times larger in size than the combined revenue of SuperCom and OTI**. So investors may be surprised to see that— **maybe—we'll announce a contract that will double our revenue in the next three years, just from one contract**.

56.     Ordan Trabelsi stated that "investors may get comfortable with a **nice margin of safety** when taking into account the **recurring revenue businesses model** and **pipeline of opportunities that could start delivering in the next few months**."

57.     Defendant Arie Trabelsi concluded that SuperCom offered investors both "very **nice recurring revenue—stable**, not so sensitive to economic slowdown" and "**rapid growth engines** that can move the company's revenue to a very high level." He elaborated:

> I'm referring to the near-term pipeline in EID and the opportunities we have right now in RFID.
>
> **The market likes visible revenues**. When investors will look at our company once we've seasoned the OTI acquisition, **they'll see our revenue baseline for the next five years, based on announced contract wins. All growth and new contracts will be gravy. Subscription businesses can achieve very high multiples**, once people understand them and the **steady free cash flows** they can generate. A year from now once we will have integrated OTI and hopefully have announced several new contract wins; we could be in a very, very different place.
>
> I mentioned before that my goal is to hit $200 million to $250 million in revenues over the next 5 years, just from organic growth. If we find other acquisitions like OTI where we can add assets that

fit into our business very well and where we can pay attractive prices, we'll consider those opportunities. On 2012 pro-forma we just tripled our revenues, yet I feel that we are only getting started with where SuperCom can go.

58.     The article explained why Lazarus was so excited about the Company's prospects following the acquisition. Specifically, SuperCom offered "a ***recurring revenue model with long term visibility***," "a loyal customer base that's extremely sticky," and "growth opportunities that offer the prospect of multiplying the top line." The article elaborated:

> **A business Buffett would love.** SuperCom's EID segment has many of the hallmarks of a classic, defensible business - the type Warren Buffett and other savvy investors are drawn to. Globally, there are only about a dozen full service solutions providers for national identity systems. No surprise, governments are very, very picky about whom they entrust to run these sensitive programs. SuperCom has a track record of successfully implementing programs for over 20 governments. If you are a competitor looking to get into this space but haven't already done it for years someplace else, you don't have a chance.

> The contracts are ***long term*** in nature, with ***stable recurring revenues, often paid monthly***. Five to seven years is typical for a contract minimum, as are multi-year renewals. Some of SuperCom's contracts have been in place for 15 to 20 years. The reason for this is very simple: once you run a massive national program on a system, you can't switch that easily.

59.     The article focused particularly on SuperCom's "pipeline," which Lazarus thought would alleviate one of the biggest risks facing SuperCom:

> To be fair about it, the flip side to having very sticky customers means that the decision-making process for a contract award can take 2 to 3 years. This makes it hard to add new contracts over a

short period of time—*__unless you happened to have acquired a__* *__full pipeline of RFP bids, the way SuperCom just did__*.

60.     The article emphasized how Defendants Arie and Ordan Trabelsi had portrayed SuperCom's pipeline:

> **The pipeline.** In the interview you'll read SuperCom management get into the details surrounding their pipeline of opportunities. In brief, they are feeling great about things since they not only took out their largest competitor but also got to add that competitor's pipeline to their own. *__The combined pipeline__* *__included over 50 bids in more than 20 countries. The bids__* *__SuperCom has out are at various stages, with a number of__* *__contracts expected to be announced in 2014. The contracts__* *__vary in size, from $5 million to $150 million__*. There are larger contracts out there, but SuperCom wisely chooses not to compete against industry giants such as 3M (NYSE:MMM) and Gemalto (OTCPK:GTOMY).
>
> Based on the interview it sounds like SuperCom only needs to win 10% to 15% of the contracts they are bidding on to keep busy for the next 7 years. Arie, SuperCom's CEO, commented, "I do believe that, if we can make the most of having both companies combined together, that a win rate of over 10% is very, very achievable."

61.     The article further emphasized what Defendants Arie and Ordan Trabelsi said this could mean for the Company:

> *__Listen further to what Arie is saying about the magnitude of__* *__what's possible with the EID pipeline of opportunities__*:
>
>> "In the EID market we talk about contracts that, in many cases, can be 3-times larger in size than the combined revenue of SuperCom and OTI. So investors may be surprised to see that—maybe—we'll announce a contract that will *__double our revenue in the next three years,__* *__just from one contract__*."
>>
>> - Arie Trabelsi, SuperCom's CEO

After growing revenues from $9 million to $26 million with the OTI acquisition, **SuperCom is suggesting that it has multiple opportunities that can again triple revenues to the $78 million range**.

### Building Up Investors' Expectations in 2014

62.     Having built up the market's expectations for how valuable even a single contract could be, SuperCom began issuing press releases announcing new contract wins, along with projections for when revenues from such contracts would be recognized.

63.     Before the acquisition, OTI had announced on November 25, 2013 that its SmartID division had received a "follow-on order" from an existing customer "for the provision of support and maintenance for implementation of a computerized driver's license system." The order would involve six months of work and would generate approximately $3 million for SuperCom.

64.     In February 10, 2014, SuperCom issued a press release to announce "that it has received **new orders**, totaling in excess of **$4 million**" and that the "Company **expects to deliver and recognize the full value of the orders during the first half of 2014**." The press release quoted Defendant Arie Trabelsi, who commented that he was "very pleased with these new orders as it represents the realization and the potential in our proposals and bids pipe line."

65.     The February 10, 2014 press release did not name the customer or describe the nature of the work, but it did quote a SuperCom VP who commented, "We are happy to see that our customers are highly satisfied with the outstanding products

and systems that we provide them, demonstrated by their award of new orders to us."

This suggests that the "new orders" were from existing customers, also known as

"follow-on" orders.

66.     On March 27, 2014, SuperCom issued a press release announcing its

2013 financial results: revenue of $8.8 million and net income of $6.5 million. On the

same day, it also issued a separate press release announcing that "it has been selected

as the ***winning bidder for contracts amounting to over $25 million***" and that the

"***majority of the revenue from the realization of those contacts will be***

***recognized in 2014***." The press release quoted Defendant Arie Trabelsi stating that

"we are starting to realize the potential of our ***vast and growing pipeline***" and that

these contracts had the "potential to lead to long-term relationships and additional

orders in future."

67.     SuperCom's stock price increased. Having closed at $6.10 on March 26,

2014, it closed at $6.42 on March 27, 2014 and then at $6.58 on March 28, 2014.

68.     On April 23, 2014, SuperCom announced in a press release that it had

been "awarded 2 new contracts from an existing customer totaling $3.6 million" and

that it "expect[ed] to recognize the majority of the contracts' revenue during the second

half of 2014."

69.     As SuperCom kept announcing new contracts, investors became

increasingly excited. For example, on May 7, 2014, Jaret Wilson published an article on

*Seeking Alpha* titled "SuperCom Presents A Superb Opportunity," describing the

Company as follows:[4]

> Take another look, and you'll find a successful turnaround, a
> massively accretive acquisition, exploding revenue, and untapped
> product lines. SuperCom's rapid growth leaves it grossly
> undervalued, while its ***established contracts and recurring
> revenues give investors a margin of safety, leading to an
> asymmetric risk/reward opportunity. Based on significant
> new business that has already been won and should be
> reflected in the second quarter, the stock has limited
> downside*** and the potential to double or more.

70.     The article elaborated about the perceived reliability of the Company's

recurring revenue:

> ***The business is very sticky***. Once SuperCom gets a new
> customer, they are likely to keep them, because a government is
> motivated to not switch providers for reasons of cost efficiency,
> backwards compatibility, service, and security concerns.
> SuperCom has had one Eastern European customer for more than
> 19 years, and other customers for more than 10 years.
>
> ***Contracts have strong recurring revenue, typically ranging
> between 60% and 80%. In other words, a $10 million
> contract will have $6 million to $8 million of revenue in
> subsequent years*** from additional service, supplies, software
> updates, and equipment.
>
> ***Gross margins in this business are very high, exceeding 80%***.

71.     The article explained how the Company had won over the author's

skepticism, emphasizing the importance of the Company's pipeline:

---

[4] J. Wilson, *SuperCom Presents A Superb Opportunity,* May 7, 2014,
http://seekingalpha.com/article/2197933-supercom-presents-a-superb-opportunity.

SuperCom CEO, Arie Trabelsi has a goal of $250 million in revenue in 2018. When I first heard this, I must admit I was skeptical. ***It seemed ludicrously high*** for a company of $26.3 million in revenue (and less than $9 million before the SmartID acquisition.) ***My skepticism began to fade when I saw that SuperCom had won a new contract of over $25 million, and two smaller contracts from existing customers of $4 million and $3.6 million. Given the number of bids SuperCom has in the pipeline***, another major contract win ($10 million-$100 million) is likely for 2014.

72.     On June 9, 2014, before trading opened in the United States, SuperCom issued a press release announcing financial results for the first quarter of 2014: revenue of $5.3 million and non-GAAP operating income of $1.8 million, compared to $0.7 million and $2.0 million respectively in the first quarter of 2013.

73.     The June 9, 2014 press release quoted Defendant Arie Trabelsi stating:

> ***Our revenues in the quarter were primarily recurring revenue.*** This, in combination with our newly awarded contracts, underlies our expectations of strong revenue growth and high levels of profitability in the coming quarters. In addition, in the coming months we hope to unleash further revenue potential from our ***fast growing pipeline of bids and proposals.***

74.     The June 9, 2014 press release further emphasized that "during the first quarter, SuperCom was awarded over $29 million . . . in new contracts, ***the majority of which will be recognized during the last three quarters of 2014***."

75.     In response, SuperCom's stock price closed at $10.06 on June 10, 2014—11.16% higher than the $9.05 closing price on June 9, 2014.

76.     On August 4, 2014, SuperCom announced in a press release that it had

been "selected as the ***winning bidder for new contracts*** representing more than ***$22

million*** in size," elaborating in pertinent part as follows:

> SuperCom will provide its various core and flexible electronic-ID
> solutions, with ***potential for additional follow-on orders in
> the future*** as is commonly realized with new customers. The
> ***majority of the revenue*** from the implementation of these
> contracts ***will be recognized within the next 9 months***.

> Commented Arie Trabelsi, President and CEO of SuperCom, "We
> are very pleased to have been selected as the winning bidders for
> these new significant contracts, clearly demonstrating our abilities
> and success in monetizing our vast and growing pipeline. We
> believe that these type of contracts are the initial stage in our
> building of a long-term relationship with new customers and will
> potentially bring us additional orders in the future.

77.     On August 25, 2014, SuperCom reported in a press release titled

"SuperCom Reports Quadrupled Revenue and Record Results for the Second Quarter

of 2014" that revenue had increased by 274% to $7.1 million and GAAP operating

income had increased by 340% to $2.2 million, compared to $1.9 million and $0.5

million respectively in the second quarter of 2013. The press release quoted

Defendant Arie Trabelsi:

> ***These results were built on growing recurring revenues
> from our ongoing contracts*** as well as the start of the
> implementation of the new contracts. We are outperforming our
> business plan both on a financial and operational standpoint. . . .
> We remain very optimistic as we unleash the potential inherent
> within ***our growing pipeline of bids and proposals,
> combined with the growing demand for our solutions in
> both the eID and M2M markets.***

78.    On November 3, 2014, SuperCom issued a press release titled "SuperCom Reports 8x Year-on-Year Growth in EBITDA and Record Financial Results for the Third Quarter of 2014." The press release also described "New contracts totaling $57 million in size" as one of the "Operational Highlights to-date in 2014."

79.    In a conference call later that day, Defendant Ordan Trebelsi described purported improvements to the Company's sales and bidding process:

> Our base process has also become more efficient. While once we were able to send out only one proposal every one to two months, we can send up to three proposals for a month, a significant increase in our bidding capacity. As we implement more successful projects around the world, **we're getting better proposals from the field, which helps us track more appropriate proposals**.
>
> . . . . If you not guarantee a higher rate of contract wins, **we are approaching the challenge systematically and increasing the likelihood of winning new business over time**.[5]

80.    Defendant Ordan Trebelsi then reiterated the "$57 million in contracts we have won so far this year" and described "how [the] typical contract is structured":

> As I mentioned in the past, we measure a contract for stated value, which we then increment over steady period booking the contract value as revenue.
>
> After the implementation is completed, **we typically receive between 20% to 30% of the contract value as recurring revenue annually**. This is additional to the initial stated amount. **We currently receive such recurrent revenue from contracts**

---

[5] Seeking Alpha, *SuperCom's (SPCB) CEO Arie Trabelsi on Q3 2014 Results - Earnings Call Transcript*, Nov. 3, 2014, http://seekingalpha.com/article/2632575-supercoms-spcb-ceo-arie-trabelsi-on-q3-2014-results-earnings-call-transcript?part=single.

> ***previously implemented by both SuperCom and SmartID, as
> reflected in our Q1 and Q2 revenues***.

> As we continue to win more new government customers, ***our base
> of recurring revenue will grow, and with it, our margins***.

81.    On November 6, 2014, an article titled "SuperCom nears major
acquisition" was published in *Globes*, an Israeli business magazine. It quoted Arie
Trabelsi as saying that SuperCom was "considering a major acquisition, which will
triple our sales if it goes through," as the acquisition candidate is "very profitable" and
was expected to expand SuperCom's EID business in Western countries. The article
also stated the following, in relevant part:

> In EID, the company ***recently won two large government
> contracts (amounting to an aggregate $50 million)***, and
> ***Trabelsi believes that there will be more such contracts in
> the near future***.

> \* \* \* \*

> SuperCom does not provide quantitative forecasts but Trabelsi
> predicts that the trend of growth and expanding profit margins
> will continue in the fourth quarter and in 2015. The company's
> revenue since the beginning of the year totaled $21.5 million, and
> ***SuperCom is still aiming at annual revenue of $250 million
> in 2018. "We believe we'll reach it, maybe even earlier***.
> Growth will be both organic, by winning large tenders, and
> through acquisitions, which will shorten time-to-market," Trabelsi
> says.

### The December 2014 Interview

82.    On December 22, 2014, Lazarus Management Company published an
article on *Seeking Alpha* titled "SuperCom's CEO: I'm Up More Than 50x And Still Not

Selling," which included an interview with SuperCom CEO Arie Trabelsi and Vice President of US Operations Ordan Trabelsi.

83.     In that interview, Defendants explained why investors should expect 2015 to be even better than 2014 for the Company. Arie Trabelsi described growth and improvements in the Company's bid capacity:

> Previously we were only able to bid on maybe one tender every two months. Now we're up to around three tenders a month in capacity. As we said, ***our bids are becoming more strategic and more tailored to the customer*** and our reputation is growing. So, ***not only do we have more shots on goal but they are also more targeted***, which we think will lead to strong growth over time.

84.     Asked about the Company's pipeline, Defendant Arie Trabelsi stated:

> First of all, ***we see a growing pipeline; now we have more and more proposals and bids out there. We also see more proposals that are getting to late stages***. So, we are very optimistic.
>
> The new thing that we see in our pipeline: I am getting more and more requests for proposals from the other areas of our business, from M2M and even for our payment solution. So, ***definitely, from quarter to quarter, our pipeline is growing and getting more valuable***. Although, like Ordan said, these are competitive bids and there is no certainty that we will win any new awards.

85.     Asked for more details, Defendant Arie Trabelsi stated:

> ***[W]e have said in the past that the size of the proposals we are bidding on goes up to $200 million***. . . .
>
> I also want to mention that we raised the bottom limits of our tender. ***Right now, we are working only on proposals above certain level. We are no longer trying for some of the smaller proposals we used to go after***. There are many opportunities out

there and we have to focus and put our best people on the larger proposals to win.

86.     Asked to respond to "an author on Seeking Alpha that published a bear thesis on SuperCom," Arie Trabelsi stated:

> I have no idea where this author gets his information from, but I think he has his facts wrong. He has publicly stated that he has a short position in SuperCom.
>
> **We added $57 million in new contracts this year**, so it's very clear that we are growing. **Our contracts include license, maintenance fees, and consumables, so we, like other players in our industry, have recurring revenue**. We talked before about **our growing pipeline** and the proper industry data is out there, so it's just wrong to argue that the opportunity is not growing, especially in our addressable markets.
>
> The year 2014 was not a special year in my mind. It's part of our growth path. There is increasing demand for our products and there's a big difference between SuperCom today compared to years ago in that right now we are better able to address the market. **We are winning more contracts. I can say that right now I see no reason to believe that the years 2015 or 2016 are going to be weaker than 2014**.

87.     Defendants also emphasized the reliability of the Company's forecasting, particularly as to recurring revenue.

88.     Asked about a SuperCom presentation that stated "at least 20% to 30% of revenue from new contract deployments tends to become annual recurring revenue," Defendant Arie Trabelsi explained the nature of the Company's revenue streams:

> The types of revenue in our EID division are several forms. First is the deployment and that includes hardware, training, systems and server set up, software development, and so forth, all during the initial deployment phase. This phase can last nine months, a year, or even two years, depending on many factors.

Then **afterwards, there's a very recurring nature to our revenue** because the government will have to continue to print out cards, or passports, or some other document which are the consumables we sell. In addition, the governments will continue to pay for maintenance and for licensing the software.

As an example: **we have currently at least two contracts** with governments that have each been **running for years at a rate of over $4 million annually**, primarily in consumables, maintenance, and software fees, and that represents over 30% of their initial deployment amounts.

89.    Defendant Arie Trabelsi added that "if the full amount of the deployment is $100 million, that means 20% to 30%, or $20 million to $30 million, every year will recur, after the deployment," and that "[c]ontracts can run as long as 25 years."

90.    Defendant Ordan Trabelsi further explained the Company's purported ability to reliably forecast its recurring revenue:

Sometimes you contractualize maintenance or licensing or the consumables. Sometimes they pay us per document printed. So, one way or another, you are supplying their needs for the systems and the systems by nature have recurring revenue needs. Also, keep in mind, that governments can't make changes overnight. The process of running a bid for a new provider and then switching systems takes years. **So even when we don't have a long term guaranteed minimums, we still have really good visibility**.

It's basically the razor and the razor blade model. We know that for every document they print, they're going to have to pay us in one way or another, in most cases. **We get estimates and various assurances from the governments of what they're going to do to maintain a certain stream of document issuance and what their rates of document issuances have been in the past**. Using that, we're able to put the project together and get a forecast of what we think will happen in the future. **We've been doing this for over 25 years, and with much of the same personnel so by now we've become fairly good at building the**

> *project and forecasts properly*. We are very focused on
> providing excellent service and strong technology because that
> helps maintain customers, which is what retains and grows the
> recurring revenues.

91.     The article went on to describe the author's expectations for the

Company's future, based on the new contracts the Company had announced so far in

2014 and the author's understanding of Defendants' statements during the interview:

> [I]f history is any guide, *20-30% of the new contract amounts*
> *should become annual recurring revenue* after their
> deployment phase. Taking the midpoint of this range implies about
> *$14 million in recurring revenue*. SuperCom's recurring
> revenue is some of the highest gross margin revenue the company
> produces, so we think *it can have EBITDA margins of 40% or*
> *higher, or about $5.5 million in recurring EBITDA*. Value
> that at a 10x multiple and you have *$55 million in value for the*
> *recurring revenue portion of SuperCom's new contracts this*
> *year*. That equals more than a third of the company's market cap.

92.     Based on this understanding, the article concluded that SuperCom had a

"uniquely attractive" business model with long-term, "extremely sticky" contracts that

produce high-margin recurring revenues while giving the Company "a huge edge in

competing for incremental business."

## The Company's False And Misleading Revenue and Earnings Guidance

93.     On January 21, 2015, SuperCom announced in a press release that it

"anticipates *revenue growth for the full year ended December 31, 2015 to*

*exceed 40%* on a year-over-year basis and anticipates ***non-GAAP EPS for the***

***2015 to exceed $1.20 per share***"(the "2015 Outlook").[6] The press release continued:

> "***SuperCom has won new contracts exceeding $60***
> ***million during 2014, and more than $25 million of this is***
> ***expected to be booked during the next nine months***, giving
> us a strong base to start 2015," commented Arie Trabelsi,
> SuperCom's President and CEO. "This new business
> demonstrates increasing demand for our e-ID, e-Passport and e-
> Gate solutions, and ***we are encouraged by the number,***
> ***quality and size of opportunities we have in our sales***
> ***pipeline***. The progress made during 2014 bolsters our
> confidence as we head into 2015, and I have never been more
> optimistic about SuperCom's future. Macroeconomic conditions
> have not materially impacted the overall market and
> incremental growth, coupled with ***our growing base of multi-***
> ***year contracts***, sets the stage for a strong end to 2014 and an
> even more robust 2015."

94.    At this point, SuperCom had only reported financial results for the first

three quarters of 2014: a total of $21.46 million in revenue ($5.3 million, $7.1 million

and $9.1 million in each quarter) and $0.63 in non-GAAP EPS ($0.13, $0.20, and $0.30

in each quarter). SuperCom later reported a total of $29.7 million in revenue and $0.80

in non-GAAP EPS for the full year of 2014.

95.    Thus, for the Company to meet the 2015 Outlook, it would need ***$41.6***

***million*** in revenue and its non-GAAP EPS would have to increase ***50%***.

---

[6] News Release, Jan. 21, 2015, *SuperCom Provides Preliminary Outlook for 2015*,
republished by PR Newswire, citing "SOURCE SuperCom Ltd."

## Why the 2015 Outlook Was False And Misleading

96.     The guidance in the 2015 Outlook was false and misleading because SuperCom lacked a reasonable basis for such an optimistic forecast for revenue or earnings growth.

97.     Public companies are not required to disclose projections of future economic performance; in fact, for many years, SEC regulations forbid such disclosures because they were thought to induce undue reliance among investors who would tend to attribute to them an unjustifiable degree of certainty. If a public company does disclose such projections, the projections must represent management's "good faith assessment" of the Company's future performance, for which management "must have a ***reasonable basis***."[7]

98.     Moreover, a registrant's responsibility to "make full and prompt disclosure of material facts, both favorable and unfavorable, regarding their financial condition" also extends to situations in which "management knows or has reason to know that its previously disclosed projections no longer have a reasonable basis."[8]

99.     Finally, "the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of the projections."[9]

100.     Accordingly, the Company should only have provided guidance with respect to revenues that were estimable with reasonable certainty, and it should have

---

[7] SEC Regulation S-K, §229.10 (b)(1).

[8] SEC Regulation S-K, §229.10 (b)(3)(iii).

[9] SEC Regulation S-K, §229.10 (b)(3)(ii).

disclosed information allowing investors to understand the basis for and the limitations of the guidance.

101.    In fact, Defendants had repeatedly sought to assure investors that SuperCom's recurring revenues were estimable in this way. As early as December 2013, a major component of SuperCom's basic value proposition was that it offered "a recurring revenue model with long term visibility." Similarly, Defendant Ordan Trebelsi insisted in the December 2014 Interview that the Company had "really good visibility" over its recurring revenue streams. And as detailed below, Defendants insisted repeatedly throughout 2015 that the 2015 Outlook was based solely on (a) recurring revenues from existing long-term contracts and (b) deployment revenues from contracts that had already been signed.

102.    Nevertheless, as investors would later learn, the 2015 Outlook in fact depended, at the very least, on the assumption that the Company would sign new contracts.

103.    To the extent that the 2015 Outlook depended on the signing of new contracts from the Company's vaunted "pipeline," confidential witnesses confirmed that SuperCom had an ineffective revenue forecasting process that made it impossible for it to provide reliable revenue guidance that had a reasonable basis.

104.    According to Confidential Witness 2, a regional director of sales at SuperCom from August 2015 to April 2016, "95 percent of the leads coming in to the Company were just blah, blah, blah"—they "were not real leads."

105.    According to Confidential Witness 2, SuperCom chased "every tender worldwide," ranging from $50,000 to several million dollars, with no clear strategy.

106.    According to Confidential Witness 3, a business development manager in SuperCom's Geographical Information Sales ("GIS") department from March 2015 to December 2015, the GIS department submitted tens of leads to the pipeline, ranging up to $100 million but mostly worth between $1 million and $5 million. He believed SuperCom had "no chance" at many of them, and he could recall only one contract (worth $750,000) that it had a strong chance of closing.

107.    According to Confidential Witness 2, the Company's internal sales pipeline database was a "very simple Excel spreadsheet." The Company had no written policy about what information must be included with each lead in the pipeline. The Company's sales staff could thus add tenders to the sales pipeline database without doing much work to determine if SuperCom could legitimately obtain and service them. They simply had to list the name of the tender, the customer, a description of the job, the products to be delivered, and the value. This was a stark contrast with Confidential Witness 2's previous work experience at another company, where (a) the sales pipeline was a more detailed database, (b) salespersons were required to maintain estimates for the probability of each lead's potential to close and to update them regularly, and (c) leads could not be added to the pipeline unless they had a certain probability of success. But SuperCom kept leads in its internal pipeline that had not been updated for months.

108.    According to Confidential Witness 3, potential leads were not removed from the sales pipeline unless the underlying tender or project had been cancelled or given to a competitor.

109.    Defendant Arie Trabelsi was well aware of the status of the Company's pipeline. According to Confidential Witness 3, each department submitted a weekly spreadsheet to him listing all potential sales leads and then presented them at a weekly sales meeting.

110.    According to Confidential Witness 2, the weekly sales meeting was attended by the regional directors for each geographical region (including Africa, South America, North America and the Far East); VP of Sales Haim Confino; the Chief Legal Officer; and, most of the time, Defendant Arie Trabelsi.

111.    According to Confidential Witness 3, Defendant Arie Trabelsi was "very central" and was updated immediately if something was going wrong with a potential lead.

112.    The 2015 Outlook was also based on the assumption that the Company would recognize at least $25 million in revenues in 2015 from contracts signed in 2014. And the Company's press releases announcing new contracts generally provided guidance as to when the revenues from each newly-announced contract would be recognized.

113.    But creating accurate revenue guidance and revenue forecasts requires, among other things, reasonably reliable underlying data indicating when products would be delivered.

114.    Under SuperCom's revenue-recognition policy, as described in the 2014 20-F, revenue from product sales and services can only be "recognized when persuasive evidence of an agreement exists, services have been rendered or delivery of the product has occurred, the fee is fixed or determinable, collectability is reasonably assured, and only if inconsequential or perfunctory performance obligations, if any, remain."

115.    However, according to Confidential Witness 1, a member of SuperCom's IT support team until January 2016, even though many of SuperCom's contracts imposed steep penalty fees for late deliveries, SuperCom's deliveries were still late "all the time." For example, products that should have been delivered to Zambia in mid-2015 had not been delivered as of January 2016.

116.    Moreover, according to Confidential Witness 1, Defendant Arie Trabelsi was fully aware of SuperCom's inability to make timely deliveries because he received daily reports from the research and development team. In fact, the Company fired Zeev Greenberg, the manager of research and development, precisely because of this timeliness problem.

117.    According to Confidential Witness 1, this was part of a broader problem: many of SuperCom's customers were not happy with its products and services. For example, neither Ecuador nor Panama renewed their contracts in 2015.

118.    Finally, the Company failed to disclose essential information regarding the assumptions underlying the 2015 Outlook such that investors could understand the basis for and limitations of the projections.

119.    For example, SuperCom's basic sales pitch to investors was (a) rapid short-term growth potential from its sales pipeline, as a single large new contract could suddenly triple the Company's revenues; (b) steady, predictable, high-margin recurring revenues through established contracts; and (c) long-term growth because every new contract would both provide short-term deployment revenues but would also add to its base of recurring revenues.

120.    This value proposition depends heavily on a growing, stable, predictable base of recurring revenues. After all, the very concept of "recurring revenues" implies revenue that is highly likely to continue in the future and is thus predictable, stable and can be counted on in the future with a high degree of certainty. And in the December 2014 Interview, Defendant Ordan Trebelsi insisted that the Company had "really good visibility" over its recurring revenue streams.

121.    The Company also repeatedly told investors that "at least 20% to 30% of revenue from new contract deployments tends to become annual recurring revenue." But while a new contract *with a new customer* might have this potential, it is highly unlikely that a new contract with an *existing* customer—a "follow-on" contract—would do so. Moreover, the revenue from a follow-on contract may not be "truly recurring revenue because follow-on contracts tend to be a year or less in length" and "the amount and timing of follow-on orders can be unpredictable."[10]

---

[10] J. Yoon, *Update: Supercom's Q3 Results Confirm Key Points Of My Bear Thesis*, Nov. 14, 2014, http://seekingalpha.com/article/2635825-update-supercoms-q3-results-confirm-key-points-of-my-bear-thesis#.

122.    Yet, until specifically requested to do so by the Securities & Exchange Commission on September 30, 2015, Defendants failed to disclose information that could enable investors to determine how much of its revenues were from (i) new deployments that could conceivably result in a long-term base for recurring revenues in the future, (ii) the high-margin recurring revenues that can provide a stable "nice margin of safety" for investors, or (iii) follow-on contracts that tend to be short-term and unpredictable and are also unlikely to result in a new source of long-term recurring revenues.

123.    In fact, the Company tried to have it both ways.

124.    In some ways, the Company treated follow-on contracts as if they were "new" contracts. For example, it issued press releases on February 10, 2014 and April 23, 2014 to announce "new" contracts with existing customers, worth $4 million and $3.6 million respectively. And when the Company announced "[n]ew contracts totaling $57 million" as an "operational highlight" of 2014, that tally included $4 million and $3.6 million from those two follow-on contracts, in addition to $25 million and $22 million from new contracts announced on March 27, 2014 and August 4, 2014.

125.    But in an important other way, the Company counted revenue from existing customers as "recurring revenues," even if that revenue was from a follow-on contract that the Company had announced in a press release. So, for example, the Company could claim in the June 9, 2014 press release that its revenues in the first

quarter of 2014 were "primarily recurring revenue." In fact, "most of the Company's recurring revenue is actually from follow-on contracts."[11]

## The Reaction to the 2015 Outlook

126.    Defendants reiterated their guidance for 2015 on March 26, 2015 and then numerous times thereafter.

127.    On March 26, 2015, the Company issued a press release announcing financial results for the fourth quarter and full year of 2014.[12] For the full year, SuperCom reported revenue of $29.7 million and non-GAAP earnings per share of $0.81, as compared to $8.8 million and $0.21 respectively for 2013.

128.    The press release quoted Arie Trabelsi:

> 2014 was truly a transformative year for SuperCom, highlighted by significant year-over-year growth, strong cash flows and an **_expanding base of recurring revenue. . . . We enter 2015 with a strong backlog, enhanced visibility for the future_**, and growing confidence that we have the right solutions, at the right time, in the right markets.

129.    The press release also explicitly reiterated the Company's 2015 Outlook, specifically "revenue growth . . . to exceed 40%" and "non-GAAP EPS in 2015 to exceed $1.20 per share."

---

[11] J. Yoon, *Update: Supercom's Q3 Results Confirm Key Points Of My Bear Thesis*, Nov. 14, 2014, http://seekingalpha.com/article/2635825-update-supercoms-q3-results-confirm-key-points-of-my-bear-thesis#.

[12] News Release, SuperCom Ltd, *SuperCom Reports Record 2014 FullYear Results*, Supercom Form 6-K, filed Mar. 26, 2015, Exhibit 99.1.

130.    The Company held an earnings call later that day, and the discussion during the call demonstrates how investors were misled by the Company's false and misleading guidance.

131.    In his opening remarks, Ordan Trabelsi touted "the number, quality and size of opportunities we have in our sales pipeline."[13] He claimed that the Company was now pursuing "even larger tenders" and had a "large amount of open proposals in various stages and many countries around the globe and we believe we are well positioned to exceed our stated goal to secure at least two to three contracts in 2015." He said the Company was "in discussions with several potential customers" in the RFID market who had issued tenders ranging from 100 units to tens of thousands of units, with each unit worth up to $3,000, and he concluded that "we believe we are well positioned to secure new contract wins in 2015."

132.    Arie Trabelsi then reiterated the Company's 2015 Outlook, specifically the Company's expectation that revenue growth in 2015 would "exceed 40% or $42 million" and that non-GAAP EPS would "exceed $1.2 per share."

133.    These statements were false and misleading because the Company had no reasonable basis for reiterating its 2015 Outlook, for the reasons stated above.

---

[13] Seeking Alpha, *Supercom's (SPCB) CEO Arie Trabelsi on Q4 2014 Results Earnings Call Transcript*, Mar. 31, 2015, http://seekingalpha.com/article/3043646supercomsspcbceoarietrabelsionq42014resultsearningscalltranscript.

134.    During the Q&A portion of the call, analysts struggled to reconcile the Company's optimistic guidance with the low fourth-quarter revenue and lack of new contract announcements.

135.    In response, Defendants acknowledged that revenue might be lumpy and difficult to predict in any particular quarter, but they insisted that the 2015 Outlook was reliable and well-grounded even in the absence of new contract wins—meaning that, if the Company *did* announce a major new contract, the Company's earnings could skyrocket well above the published outlook.

136.    In response to a question from Brian Abrams, an analyst at Lazarus, about the Company's sales pipeline, Arie Trabelsi stated that the Company had "a few large proposals out there" and was "very close to have a large contract awarded in November, December, which we believe was just a delay" that he believed would be resolved "in just 90 days." He described the opportunities in the pipeline as "just amazing" and concluded:

> So when we say we believe that we have great years of 2016, which over 42 million of revenue and $1.2 EPS, **you can be slight confident that we have all the information in hand to support these numbers** we believe revenue and margin. So I believe that in the near future we will be able announce some contracts that are larger in the $7 million attritional in the market.

137.    This led Brian Abrams to conclude that the guidance was "**on the conservative side of things**."

138.    Brian Abrams then asked about the potential upside, and Arie Trabelsi responded that the upside could be "huge" because there were $200 million

proposals out there that could "double" the Company's revenues. Ordan Trabelsi

then added that the Company was "progressing well in large and small contracts"

and saw the "same level [of] difficulty in winning either."

139.    These statements were false and misleading because the Company did

not "have all the information in hand to support these numbers," had no reasonable

basis for reiterating its 2015 Outlook, and was not "progressing well in large and

small contracts."

140.    Another analyst asked how the "$54.5 million of new contract wins"

that SuperCom announced between February and August 2014 would be reflected

in the Company's reported revenues. Ordan Trabelsi responded that SuperCom had

actually announced $60 million in new contracts and that ***$25 million would be***

***recognized "in the first nine months of 2015***"—thus reiterating the statement in

the January 2015 press release that "SuperCom has won new contracts

exceeding $60 million during 2014, and more than $25 million of this is expected to

be booked during the next nine months."

141.    One analyst asked "if there's $25 million . . . from contracts won in

2014 . . . and some recurring revenue as well" built into the 2015 Outlook's revenue

guidance, then what about the possibility of "two or three contract wins"? Defendant

Arie Trabelsi responded:

> We do analysis and we are as I said very, very conservative on
> the number and it's going to be -- ***new contract, the number is***
> ***going to be higher***.

142.    Then, towards the end of the call:

**Unidentified Analyst**

[J]ust to be clear ***does your current guidance include any of the anticipated contract wins that you have mentioned***?

**Arie Trabelsi**

***No***.

143.    Analysts responded positively to these statements.

144.    On March 27, 2015, Feltl and Company's Joshua J. Elving described SuperCom as "well positioned to take advantage of significant opportunities in electronic identification (eID), future opportunities in radio-frequency identification (RFID) and mobile payments." He gave SuperCom a "STRONG BUY rating and $16 target," with 2015/2016 revenue and adjusted EPS estimates of $47.5m/$71.8m and $1.24/$1.32 respectively. He stated that his price target was based on an 8x multiple of his "2016 EV/Adjusted EBITDA estimate of $25.6m and a 12x multiple of our 2016 EPS estimate of $1.32." He acknowledged the "lack of visibility and lumpy nature of the model (contracts are large and sales cycle can take 2 years)" but found that "SPCB is aware of this issue and is working to provide more clarity in the near-term." He further explained his optimism:

> ***We believe the Company is currently bidding on a handful of large government ID contracts, which, if won, could drive dramatic revenue growth in the near-to-mid- term***. SuperCom's patents and expertise around RFID put the Company in a good position to grow that portion of the business as RFID and the M2M technology gain momentum. In the past, ***management has discussed having a pipeline approaching $500 million in bids outstanding*** and has goals internally of driving revenue to multiples of the current run rate in the next several years. ***To the extent the Company is able to execute against even a***

> *portion of those opportunities/goals, we believe the stock*
> *should perform well*.

145.    Joshua J. Elving further described his optimism as based on the following understanding of the Company's guidance:

> On January 21, the Company put out preliminary guidance for 2015 which called for approximately 40% revenue growth and at least $1.20 in adjusted EPS. *We believe this guidance assumes SuperCom does not win any new business in 2015*.

## False and Misleading Statements Continue Into June 2015

146.    On June 1, 2015, before trading opened in the United States, SuperCom issued a press release announcing financial results for the first quarter of 2015. It reported that revenue had increased by 45% to $7.7 million in the quarter (compared to $5.3 million in the first quarter of 2014) and that its GAAP operating income had increased by 86% to $2.6 million (compared to $1.4 million in the first quarter of 2014).

147.    The June 1, 2015 press release also quoted Defendant Arie Trabelsi stating that the Company was "*increasingly excited about [its] pipeline of opportunities*, which had "*continued to grow as [SuperCom] advanced a number of important tenders* during the quarter," and that "[i]n the M2M(IoT) arena, more and more government agencies and organizations in the Americas, Europe, and Asia ha[d] selected and decided to adopt SuperCom's Electronic Monitoring solution, creating brand recognition and driving growth in [its] pipeline."

148.    The press release concluded by reiterating the Company's 2015 Outlook:

### 2015 Outlook

> *The Q1 results are in-line with our 2015 guidance of revenue growth* for the full year ended December 31, 2015 to *exceed 40% or $41.6 million* on a year-over-year basis. The Company anticipates non-GAAP EPS in 2015 to *exceed $1.20 per share*.

149.    These statements were false and misleading because SuperCom's "pipeline of opportunities" had not "continued to grow," SuperCom had not "advanced a number of important tenders during the quarter," and SuperCom was not on track to achieve such revenue and earnings growth. Defendants were also fully aware that deficiencies in its forecasting process as described herein made it impossible for the Company to provide revenue guidance that had a reasonable basis.

150.    Later that day, SuperCom held a conference call with analysts and investors to discuss the earnings release and the Company's operations. During the conference call, Defendants Arie Trabelsi, Ordan Trabelsi and Simona Green made positive statements about the strength of the Company's ongoing business metrics and financial prospects.

151.    In his opening remarks, Defendant Ordan Trabelsi emphasized that the Company was on track to meet its annual targets. He stated that the Company had been "*selected as the bidder of choice* for a number of these competitively bid contracts" and was "in negotiations with potential customers now"

152.    He reiterated the Company's full-year outlook and assured investors that the Company's expectations for future revenue were well-grounded and conservative:

> *As a general practice we announce new wins once a new contract is signed and/or a significant milestone achieved grants us high confidence in future revenues*. Taking a

conservative approach announcing new wins is a best practice and helps us as a Company avoid risk should a contract be delayed or negotiations break down. . . . I will say that as we move through 2015 our optimism has only increased and *we remain confident in our ability to achieve our full year outlook*.

153.   This was false and misleading because Defendant Ordan Trabelsi was aware of SuperCom's inability to forecast revenues due to the deficiencies in its forecasting process.

154.   Arie Trabelsi again reiterated the Company's full-year outlook before taking questions.

155.   Analysts pressed for details, with several asking what Defendant Ordan Trabelsi had meant when he'd stated in his prepared remarks that SuperCom had been "selected" as a bidder of choice. Defendants responded cagily, refusing to provide details but explaining why they were so confident about winning several contracts in the near future:

**Arie Trabelsi**

When you receive an award from an RFP, *it effectively states that you are the best bidder in terms of technology and your offering, your solution, your proposal*. Different probabilities are associated with different tenders, some tenders that very likely means that you are going to turn into contract and others there are more moving parts and more difficulties associated with it, so it's hard to give just a general number.

**Ordan Trabelsi**

*In general once you've been selected we do receive an award* or [indiscernible] for a negotiation to contract is made in a few weeks or more than that, and again if there is no obstacle at this stage and we sign a contract and [indiscernible].

156.    In response to these and other "very bullish" comments by Defendants about SuperCom purportedly having "more contract wins coming in," one analyst responded by asking why SuperCom was not raising its guidance even higher than the published 2015 Outlook. Defendant Ordan Trabelsi responded that the Company's guidance was "conservative," stating in pertinent part as follows:

> Our guidance is on a conservative nature. ***We like to take in account that we have very high visibility for like wins in 2014 that are being deployed, recurrent revenues and other things***. There are very large vendors out there and some were performing very well off and when those are, if and when those are finalized we will announce those ***and that will exceed our guidance first, so we don't take guidance into account at this stage***.

157.    Defendants were so bullish that one analyst asked whether they remained confident in the Company meeting not only its 2015 outlook, but also "some longer term goals" that they had mentioned in the past—most likely a reference to Arie Trabelsi's statements during the November 3, 2014 conference call that he expected the Company to reach "about $100 million of revenue in the next few years." Arie Trabelsi responded positively, stating that he didn't "see any reason to reduce" that long-term estimate.

158.    This was false and misleading because, as already detailed, Defendant Arie Trabelsi was aware of SuperCom's inability to forecast revenues due to the deficiencies in its forecasting process.

159.    In response to the announcements and conference call, the price of SuperCom shares rose, closing up 12% at $12.09 on June 1, 2015, on unusually high trading volume.

160.    On June 10, 2015, the Company issued a press release announcing that it had been "selected to implement new contracts representing more than $7 million." It continued in pertinent part:

> SuperCom will provide various core elements of its flexible electronic-ID solutions, with ***potential for additional follow-on orders in the future*** as is commonly realized with these types of solutions. SuperCom expects the majority of the revenue from the implementation of these contracts to be recognized within the next 2 quarters.

161.    As intended, the market price of SuperCom shares surged on these statements, closing up approximately 12% at $12.09 on June 1, 2015 on unusually high trading volume.

## The June 2015 Offering

162.    On June 17, 2015, with the price of SuperCom common stock rising in response to Defendants' bullish statements, SuperCom issued a press release announcing an underwritten public offering pursuant to a previously-filed shelf registration statement that had become effective on July 25, 2014.

163.    On June 18, 2015, SuperCom priced the offering at $12 per share.

164.    The registration statement (signed by Defendants Arie Trabelsi, Tsviya Trabelsi and Ordan Trabelsi) and prospectus used to conduct the offering (No. 333-197434) were materially false and misleading in that they failed to disclose events or

uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results, as mandated by Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto.

165.   As detailed above, by June 2015, SuperCom was experiencing a significant deterioration in its recurring revenue base, as most of what it described to investors as "recurring" revenue was in fact revenue from newly-signed follow-on contracts with existing customers. Revenue from follow-on contracts tends to be shorter-term and less predictable than truly recurring revenue.[14] Moreover, because of the deterioration of its recurring revenue base, the Company did not have sufficiently predictable revenue streams to provide a reasonable basis and was not on track to meet the guidance of the 2015 Outlook.

166.   The registration statement used to conduct the offering, however, contained no such disclosures.

167.   On June 23, 2015, SuperCom issued a press release announcing that it had successfully completed the stock offering, including the exercise of the underwriter's overallotment, selling all 2.415 million shares at $12 each, raising $29 million.

---

[14] J. Yoon, *Update: Supercom's Q3 Results Confirm Key Points Of My Bear Thesis*, Nov. 14, 2014, http://seekingalpha.com/article/2635825-update-supercoms-q3-results-confirm-key-points-of-my-bear-thesis#.

## Defendants Continue Reiterating the Annual Guidance

168.   On September 16, 2015, SuperCom issued a press release announcing its financial results for the second quarter of 2015. The Company reported $7.75 million in revenue for the quarter and $15.4 million for the first six months of 2015—increases of only 10% and 25% respectively over the equivalent figures for 2014. These figures were significantly below where they needed to be for "revenue growth for the full year ended December 31, 2015 to exceed 40%," as specified in SuperCom's 2015 Outlook.

169.   Attempting to mitigate the inevitable stock price drop, the press release excused the low revenue by claiming that the Company had been forced to "recognize[] nearly $2 million of high-margin revenues that [it] expected to recognize in late June, during the first weeks of July, shortly after the quarter closed." Defendant Arie Trabelsi (quoted in the release) stated that SuperCom again "executed according to plan in the second quarter, achieving revenue growth and strong margins while ***dramatically broadening [its] new business pipeline and solution offerings*** in [its] fast growing target markets" and had "executed on a number of strategic and operational initiatives including ***securing more than $7 million in follow on orders from existing e-ID customers*** [and] winning a highly strategic electronic offender monitoring tender with a new European government customer."

170.   He further emphasized that "***[t]he number, quality, stage and size of opportunities in [SuperCom's] pipeline [was] increasingly encouraging***"

and that "[b]ased on ***the number of open proposals*** [the Company had] around the globe in various stages and in light of [its] strengthened balance sheet following the successful offering, [it was] ***well positioned to win additional new contracts this year.***" He concluded by assuring investors that "[w]ith a ***growing base of recurring revenues*** and increasing demand for [SuperCom's] solutions," ***the Company would "meet the guidance previously issued."***

171.    These statements were false and misleading because Defendant Arie Trabelsi was aware of SuperCom's inability to forecast revenues due to the deficiencies in its forecasting process, and therefore, was in no position to determine if the Company could in fact meet the guidance for 2015 that was previously issued.

172.    Later that day, SuperCom held a conference call with analysts and investors to discuss the earnings release and the Company's operations. During the conference call, Defendants Arie Trabelsi, Ordan Trabelsi and Simona Green made positive statements about the strength of the Company's ongoing business metrics and financial prospects.

173.    In his opening remarks, Defendant Ordan Trabelsi stated that "a ***small delivery delay*** in late June pushed into the ***$2 million of high margin recurring type revenues*** that we expected to recognize during the second quarter into Q3" but insisted that "***we don't believe it will have an impact on our full year financials.***"

174.    He went on to describe the Company's sales pipeline in especially bullish terms. He stated the following about the Company's EID division:

More specifically, ***the number of advanced stage tenders in our pipeline continues to increase*** and we are in negotiations with several potential customers for contracts where ***we have been selected as the bidder of choice***. Some of these potential contracts are ***significantly larger than what we've seen in the past*** and require more working capital. . . . As a result, we closed on a public offering in June that raised approximately $70 million in net proceeds.

175.    He stated the following about the Company's M2M/RFID division:

Our M2M pipeline also continues to advance. Currently we are in discussions with several potential customers in the U.S., Latin America, Europe and Asia with issue of tenders and we have actively progressed in the public safety segment. ***These tenders range in size from annual recurring revenues of hundreds of thousands of dollars to tens of millions of dollars. Given our progress and communication with government customers, we are expected to secure additional new contract wins this year***. And as was the case of the win we announced in July, these new contracts will allow us to bid much more effectively and rapidly revenues in upcoming years.

176.    He concluded by stating that "***we believe the implementation of the two larger frontend contracts we won in 2014 will be completed at some point in 2016 in majority and convert generating high margin software license, maintenance and consumable revenues which will bolster our recurring revenues in 2016*** and provide the foundation for continued year-on-year growth."

177.    Arie Trabelsi then reiterated the 2015 Outlook, explaining that, while SuperCom's results might vary from one quarter to the next because of formal revenue-recognition policies, its *annual* revenue remained entirely predictable because of SuperCom's steady base of recurring revenues. More specifically:

As a reminder, our quarterly results are highly dependent on the relative amount of contracts related to larger formal contracts and completion revenue recognition which can lead to quarterly lumpiness that we experienced during the second quarter. ***On an annual base however and as a result of growing too much recurring revenue from existing customers, our business is surely predictable and as a result we believe we're able to effectively forecast annual guidance. . . . I believe we will meet the guidance previously issued***.[15]

178.   These statements were false and misleading because Defendant Arie Trabelsi was aware of SuperCom's inability to forecast revenues due to the deficiencies in its forecasting process, and therefore, was in no position to determine if the Company could in fact meet the guidance for 2015 that was previously issued.

179.   During the Q&A portion of the conference call, an analyst commented that, with the Company having been so "optimistic about its opportunities to win new business in 2015"—which led that analyst to expect that he would have "see[n] some things earlier in the year"—it had "been a year since [SuperCom] had any material announcements." The analyst asked whether "***anything [had] changed*** in the process, anything that would have caused delays" or whether "***anything had fallen out of [SuperCom's] pipelin***e." Defendant Ordan Trabelsi responded in pertinent part as follows:

So ***our processes we believe only improved*** in terms of amount of [indiscernible] we've been able to add with our enhanced team

---

[15] Seeking Alpha, *SuperCom's (SPCB) CEO Arie Trabelsi on Q2 2015 Results Earnings Call Transcript*, Sept. 22, 2015, http://seekingalpha.com/article/3527176-supercoms-spcb-ceo-arie-trabelsi-q2-2015-results-earnings-call-transcript?part=single.

over time to be more effective in how we bid on things and how we gather the intelligence necessary for bidding on proposals. ***What has changed strategically which might have a small impact on longer time schedules is the size of the tenders***. We are increasingly looking at larger and larger tenders and they sometimes do take a bit longer to turn into a final contract, especially from when you get actual win. But generally speaking this business, sometimes you have periods of time we have a lot of wins that are close together and other times a bit more spread out. ***But on a statistical trend when we look at, we are only increasing our capability to win more of these projects. And we expect that when you average it over time, you will see much larger contract wins and revenues associated with them in upcoming, near future.***

180.   Unsatisfied, the analyst asked more directly: "***Has anything fallen out of your pipeline?***" Defendant Ordan Trabelsi's responded that "[*t]hings always do fall out of the pipeline and other things come to replace them*. I would say that ***the opportunities we have been mostly excited about have stayed in and we still feel good about them***."

181.   As analysts continued to press for answers, Defendants first tried to reassure them by emphasizing their own purported continued confidence in the Company's sales pipeline, but analysts kept asking for details that might provide a basis for such confidence. In response, Defendants made several increasingly positive and specific false statements about their sales pipeline.

182.   Asked specifically how the Company could have "a high degree of confidence reaffirming this year's guidance because we're already in September," Arie Trabelsi insisted that "we have a much better knowledge" regarding annual financial results simply by "look[ing] at the contracts and . . . at recurring revenue."

Ordan Trabelsi added that "when you look at the way the quarter is split up in our business that doesn't really comply with any timelines or obligation to our customers" (which meant that revenues might be lumpy between one quarter and then next), whereas "[i]f you look at our annual basis, that does actually have more meaning and more implications to the operations."

183.    Later, Arie Trabelsi stated that he remained "comfortable with our earlier projection this year for the five years' plan and in some cases I think we feel that we achieve it even faster than we expected."

184.    Defendants also reassured investors that the lack of new contract announcements meant only that they had been delayed.

185.    Asked about certain contracts that SuperCom had expected to win by year-end, Defendant Ordan Trabelsi stated that "[t]here are some ***projects that we've already been awarded*** and they give us more confiden[ce] than others," suggesting that the only thing left was "a process between award's actual signing and starting of the contract which can take a variable amount of time."

186.    Another analyst, noting that "the market is clearly getting a little bit impatient waiting for another big e-ID contract to materialize," asked "what it means to be selected as the bidder of choice" and how that relates to a final contract announcement. Ordan Trabelsi responded that the difference was "less of issue of your ability to win projects, it's more of how conservative you are and how you wish to act going forward in the operation"—for example, a company that wants to be

conservative might insist on more drawn-out contract negotiation before signing. The following exchange followed:

> **Brian Abrams**
>
> So, I'm understanding that basically *you're just being fairly conservative about when you would announce any contracts even if you feel like you've made a lot of progress* in certain instances, is that right?
>
> **Ordan Trabelsi**
>
> Yes. Our general methodology is to announce the contracts once they're signed or another -- very high confidence makes us believe that the projects will start. Even though there's several [indiscernible] for that, we actually win or selected, *we take a conservative approach and only announce once s we're at the "final stage" and actually starting a deployment*.

187.   Another analyst asked whether the Company's 2015 outlook was based on the assumption of "potential new business that you see with the high visibility of closure" or was "strictly on business that you have already." Arie Trabelsi responded that most of it was based on "*recurring contracts that we have in hand*" and that, although some of it was based on new contracts, he did not "see any reason" for "discomfort" because, "[f]or example, *we have a contract that is over $15 million*" for which SuperCom had been "already selected as the bidder of choice" and was "preparing it for delivery" but "it just got delayed." Ordan Trabelsi added that SuperCom had "*deployments from 2014 that are expected at churn level to be recognized in '15 which we've given in our guidance*" and that "the large projects, the very large ones we're talking about are

not included and will be above what we gave as original guidance when we built it out."

188.   Another analyst asked how Defendants could be so confident now, when only nine months ago they had confidently predicted many new contracts that had not yet come to fruition—specifically, *had "something changed in the pipeline"* that provided Defendants with "greater confidence that these proposals will indeed come to fruition?"

189.   Ordan Trabelsi responded that SuperCom had shifted its focus onto "bigger, more profitable, more valuable contracts" and had successfully "w[o]n an RFP against much larger players," but was simply taking time to "make sure we have the right infrastructure in place." He concluded

> But *we do have all the right signals from the market to give us high confidence that we are in the right way*. And that could be even the small things as many other players coming to us and large tenders are out and asking for us to partner with them. So some of the players that are in the market they see our success in the tenders and our capabilities are growing. And *soon when we are at the stage, we will announce properly to the market and you know that with our conservative approach we have taken all the rights steps to ensure that our announcement actually comes into highly predictable future generation of revenues and profitability at a high margin*.

190.   Defendants' mostly positive comments had their intended effect: the price of SuperCom stock declined only moderately from its close of $9.04 on September 15, 2015, closing at $8.31 on September 16, 2015. The price of the stock thus remained

artificially inflated; if Defendants had revealed the full truth, the price would have fallen even more.

## The Truth Begins to Emerge

191.    On September 30, 2015, the Company received a letter from the SEC commenting on SuperCom's 2014 annual report, filed on Form 20-F on April 13, 2015 ("2014 20-F") and demanding that future filings provide more detailed explanations as to changes in the Company's mix of revenue and the resulting impact on the Company's gross margin.

192.    The 2014 20-F had described the Company's revenue as follows:

*Revenues*

Our revenues in 2014 were $29,703,000 compared to $8,822,000 in 2013, an increase of 237%. This increase is mainly related to new ΣID division multiyear projects, in the amount over $54 million, received and partially deployed and recorded during 2014. Some of the projects received are a direct result of the customer relations acquired in the acquisition of OTI's SmartID division in December, 2013, and some are related to new customers. In 2014, our revenues were generated mainly from maintenance and project management.

193.    The 2014 20-F had described the Company's gross profit as follows:

*Gross Profit*

Our gross profit in 2014 was $22,402,000 compared to $6,926,000 in 2013, an increase of 223%. The gross profit margin for 2014 was 75% compared to 79% in 2013.

The decrease in our gross profit margins is partially attributable to changes in our mix of revenues in 2014 due to deployment of new projects with lower gross margin, and partially due to amortization

related to SmartID division software and IP assets acquired in 2013.

194.   The 2014 20-F also stated:

As of December 31, 2014 *we have long term contracts that will continuing to be deployed in 2015 and going forward*. As of December 31, 2012 and 2013, all the long-term contracts were completed and their related revenues were recognized in full.

195.   The SEC Letter noted that the 2014 20-F stated that the Company generated revenues from "deployments under contracts with new customers and relationships acquired via the SmartID acquisition," but did not specify "the amount of change attributable to new customers, the number of new customers, and the amount attributable to the relations you acquired." Nor did it specify how much of the additional revenue from deployments related to partial deployments or "how much deployment remains on those projects." SuperCom's 2014 20-F also failed to "clarify how [the] mix of revenues changed such that gross margin was impacted."

196.   The SEC demanded that future filings, "similar to the discussion during management's fourth quarter earnings call, describe the proportion of revenues generated from new contract deployment and the proportion of revenues categorized recurring, such as consumables, maintenance and licenses, and the impact that proportion had on gross margin."

197.   The Company responded to the SEC's letter on October 8, 2015, promising broader disclosures on revenue sources going forward.

198.    All of these issues directly relate to information that would have been material to investors in determining whether the Company's past performance was indicative of its future performance.

199.    The Company included more detailed disclosures in the 2015 20-F concerning the sources of its revenues:

> *Revenues*
>
> Our total revenues in 2015 were $28,340,000 compared to $29,703,000 in 2014, a decrease of 4.6%. As at the end of 2015 the Company completed the deployment of approximately 83% in average of three of our ΣID division's projects for which the Company recorded $13,720,000 in 2015 compared to $17,985,000 in 2014. In 2015 recurring revenue amounted to $14,620,000 out of which $9,870,000 related to projects from customer relations acquired in the acquisition of OTI's SmartID division in 2015. 2014 recurring revenue amounted to $11,718,000 out of which $7,577,000 was related to the acquired OTI's SmartID division.

## New Revelations in November 2015

200.    On November 17, 2015, SuperCom issued a press release before market open announcing that its CFO, Defendant Simona Green, was "departing," that the Company's former controller and Vice CFO would become "its ***acting*** Chief Financial Officer," and that the Company was also naming a new Chief Information Officer. On the same day, it issued a separate press release announcing that it had acquired Prevision Ltd., a cybersecurity company.

201.    SuperCom's stock price, having closed at $8.75 one day earlier, dropped 9.7% to close at $7.90.

202.    Analysts were disappointed. On November 18, 2015, Henrik Alex published an article on *Seeking Alpha* titled "Another Year, Another CFO: Time To Short SuperCom Ahead Of Q3 Earnings." He noted that "the company today announced the third abrupt CFO departure within the last two years" and described the "elevated turnover in this key management position" as "highly concerning given that the company already has a troubling history of misleading statements and confusing press releases." He elaborated:

> Anyway, the company WILL have to show some major progress with regard to the second half of 2015. ***Quarterly revenues will have to almost double going forward to meet the company's projections for 2015***. They will also have to announce another major contract win pretty soon as investors are clearly losing their faith and patience.

203.    On November 30, 2015, SuperCom finally issued a press release with preliminary third quarter 2015 results.[16] The results were far worse than investors expected.

204.    Revenue for the quarter was "anticipated to be in a range of $5.5 million to $6.1 million"—***less than half of the $13.38 million the Company had led the investment community to expect.***

205.    The Company also slashed its revenue and earnings guidance for the year. Defendants had reiterated the 2015 Outlook as recently as September 16, 2015, insisting that they were on track for $42 million of revenue and non-GAAP EPS of

---

[16] News Release, SuperCom Ltd, *SuperCom Announces Preliminary Third Quarter Revenue and updates Full Year 2015 Forecast,* filed Nov. 30, 2015, as Form 6-K, Exhibit 99.1.

$1.20 in 2015. But now—*only a month before the end of the year*—the Company finally admitted that it would not meet the previously-issued guidance. Instead, the Company believed only that revenue in 2015 would "exceed *$30 million*" and EBITDA would "exceed *$9 million*"—hardly an improvement over 2014's $29.7 million in revenue and $9.62 million in EBITDA.

206.   The press release explained the miss as follows:

> "Our financial performance in the third quarter and full-year were impacted by our *inability to recognize more than $10 million of revenues that were expected this year*, mainly due to *delays associated with foreign government customers*," commented Mr. Arie Trabelsi, President and Chief Executive Officer of SuperCom. "This delay, while inherent in our business, is frustrating, but we believe we will be able to recognize this revenue in 2016. As a result of these delays, we are adjusting our full-year outlook. Our confidence in our continued growth in 2016 and beyond remains intact. We continue to be successful in identifying, bidding upon and winning business. Our quarterly results can be erratic based on *complex revenue recognition challenges*, but nothing that has occurred has changed our medium and long-term outlook."

207.   That same day, SuperCom issued a separate press release announcing that it had been "awarded new contracts, totaling approximately $8 million" and that it "expects to deliver and recognize the full value of the orders during the first half of 2016." The press release did not name the customer, but it quoted Defendant Arie Trabelsi saying that the new contracts "demonstrate . . . our ability to build long-term relationships," suggesting an existing customer.

208.   Defendants struggled to reassure investors on a conference call later that day, conducted by Defendants Arie Trabelsi and Ordan Trabelsi and Shahar Marom.

209.   Defendant Arie Trabelsi acknowledged "delays associated with foreign government process and approval" that prevented SuperCom from recognizing more than $10 million in revenue that the Company had expected for the quarter, but he insisted that the Company's "underlying fundamentals remain intact" and that "the vast majority of late stage opportunities we have still got [ph] remained open in the pipeline."

210.   But as Shahar Marom and then Arie Trabelsi disclosed later in the call, the government contract (that was not coming in during 2015 and thus caused the $10 million miss) *had not even been signed yet* and was *not expected to be signed for six months*. Few additional details were provided, but Shahar Marom later claimed that the delay was "mainly due to the transition with our CFO position."

211.   The Company also provided new details about its revenue streams during the call—notably, *no longer using the term "recurring" revenues*. Defendant Ordan Trabelsi stated that the Company's revenue from EID was in two main categories: (a) new deployments from "contracts we won from new customers" and (b) revenues from existing customers "in the post-deployment stage or in the steady-state." The Company had "a bit less than $12 million from *steady-state customers*" in 2014 and it expected more than $15 million in 2015 and $20 million in 2016. Later in the call, Shahar Marom added that the $8 million in "new contracts" announced earlier that day would be in the "bucket of existing customer revenues."

212.     Analysts asked why they should believe that the Company would achieve even its substantially-lowered guidance of $30 million in revenue for the full year, which would require $9 million in the fourth quarter. Shahar Marom responded:

> That's okay that we are a month before the end of the quarter and the numbers that we just mentioned we believe that we have all the full confidence to recognize in full and everything else is just going to be an upside too.

213.     An article on *Seeking Alpha* described the conference call as follows:

> With regard to the substantial revenue miss for the quarter it needed several analyst questions during the Q&A session until the acting CFO came out with an alleged $10 mln contract that so far had not been disclosed by the company but obviously was planned to contribute material revenues during Q3. Later in the call it turned out that this contract has yet TO BE SIGNED by the customer so ***the question remains why the company built its revenue forecast on contracts that not even exist until today***. It is one thing to experience revenue recognition delays due to accounting provisions but it seems quite odd to put the blame on a contract that hasn't even been signed yet.[17]

214.     The stock analyst community was "massive[ly] disapoint[ed]." For instance, Feltl and Company's Joshua J. Elving lowered his estimates, target, and ratings for SuperCom, stating in pertinent part as follows:

- ***Clearly this is a massive disappointment, approximately $8 million below our $14.0 million estimate***. We believe the shortfall is due to a delay in a 2014

---

[17] H. Alex, *SuperCom Just Delivered On (My) Expectations—Now What?* Dec. 15, 2015, http://seekingalpha.com/article/3723856-supercom-just-delivered-expectations-now.

contract announcement with an African government *that had its election delayed twice this year*.

\*      \*      \*

- *The lack of significant contract wins is also disappointing.* Management continues to believe it is close to winning a large new contract but doesn't have any further comment.

\*      \*      \*

- *We are lowering our price target to $8 from $14* based on our existing target multiple of 8x applied to our new adjusted EBITDA estimate of $11.4 million (previously $22.3m). We are reducing our rating to Buy from Strong Buy. *Clearly we were overly optimistic about the timing and/or ability of SuperCom to win significant new business and the lack of visibility into quarterly revenue and earnings is greater than we expected.*

215.    On this news, the price of SuperCom common stock plummeted by *more than 40%* from its close of $7.70 on November 27, 2015, closing at $4.60 on November 30, 2015 on unusually heavy trading volume of more than 3.3 million—approximately 20 times the average daily trading volume during the preceding ten trading sessions.

216.    The Company finally released its third quarter 2015 financial results on December 22, 2015. Revenue was $5.7 million, compared to $9.1 million in the third quarter of 2014. Even worse, *non-GAAP EPS was only $0.06*, compared to $0.30 in the third quarter of 2014.

217.    SuperCom released its (unaudited) full-year financial results on April 11, 2016, again falling well short of the Company's already-reduced guidance as well as analysts' and investor expectations. (The release had been scheduled for April 6, but

the Company postponed it "in light of a likely subsequent event that may impact the year-end financial results.")

218.    Instead of revenue of $42 million and non-GAAP EPS of $1.20, as so confidently published in the 2015 Outlook, the Company reported 2015 revenue of *$29.5 million—even lower than 2014's* revenue figure of $29.7 million. Even worse, non-GAAP EPS in 2015 was *$0.48—just over half of 2014's $0.81.* And in the fourth quarter of 2015, SuperCom had a *loss of $0.4 million* in GAAP operating income.

219.    The press release quoted Defendant Arie Trabelsi, who blamed the results on "the project-driven nature of our business, and the sometimes longer-than-expected sales cycle we are experiencing within the eID market." He concluded:

> Some of the large scale and late stage opportunities that were in our pipeline at the start of 2015 continue to move forward, the process to close these opportunities has taken longer than we originally anticipated. But this opportunities, coupled with our growing base of steady state revenue and the contribution from acquisitions made in the last few months give us confidence that 2016 will be a year of growth for SuperCom.

220.    The press release also listed several "operational highlights" for the year, including "[o]ver 25% growth in steady state revenues from existing e-ID customers from approximately $12 million in 2012 to over $15 million in 2015."

221.    During the Company's conference call later that day, Defendant Ordan Trabelsi tried to reassure investors, stating that, "[b]ased on the predictable nature of sales and revenues from existing e-ID customers, deployment revenues from our electronic monitoring contracts we announced over the past month, and expected

revenue contributions from" several recent acquisitions, "we are confident that 2016 will be a year of growth."

222.   Defendant Ordan Trabelsi acknowledged that "[e]fforts to better predict the timing of these opportunities [in the Company's EID pipeline] has proven difficult" and so the Company would "refrain from providing specific guidance at this stage."

223.   Defendant Ordan Trabelsi also described the Company's revenues in terms that acknowledged that **not all revenues from existing customers are truly "recurring"** in the sense of being predictable:

> We continue to generate recurring revenues with existing customers and follow-on orders of the government that are currently using our systems are in line with what we have historically achieved. Steady-state revenues from existing e-ID customers grew by over 25% from approximately $12 million in 2014 to over $15 million in 2015 and we expect that number to grow.
>
> Steady-state revenues consist of maintenance, licensing, consumables and software and hardware upgrades, all which are delivered through existent customers which are past their initial deployment phase. **Some of these revenues are contracted and recurrent while others are based on consumption and use**. In 2016 we expect the contribution of these revenues to grow.

224.   The expectation that steady-state revenues would merely "grow' in 2016 was far less bullish than that expressed on the November 30, 2015 call: that steady-state revenues in 2016 would exceed $20 million.

225.   An analyst asked about a "chunk of revenue that was pushed out from the third quarter"—most likely referring to the $10 million—but was told that no information was available.

226.    The Company also admitted that it was increasingly having to deal not only with longer purchase decision cycles, but also with delays in the approval of milestones. Under the Company's revenue-recognition policy, such milestones are sometimes necessary to trigger revenue recognition for certain aspects of a deployment contract.

### ADDITIONAL SCIENTER ALLEGATIONS

227.    Defendants acted with scienter in that they knew, or recklessly disregarded, that the public statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws.

228.    Defendants' scienter is supported by the fact that their statements concerned the key revenue stream for SuperCom. Defendants can be deemed to have knowledge of the key facts concerning its most important revenue stream, particularly given SuperCom's small size. The following table presents the number of employees by department, according to the 2015 20-F:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | **2015** | **2014** | **2013** |
| **Research, Development & Operations** | 97 | 52 | 37 |
| **Marketing and Sales** | 23 | 15 | 12 |
| **Administration** | 18 | 16 | 9 |
| **Total** | 138 | 83 | 58 |

229.    Defendants repeatedly assured investors that they had detailed knowledge of the status of the Company's sales pipeline and that investors should therefore trust Defendants' "confidence" that the Company would meet its 2015 Outlook, win new contracts, and so forth. Confidential witnesses confirmed that the Company's database for tracking sales leads was itself utterly deficient as well as that Defendant Arie Trabelsi was personally aware of the status of the sales pipeline. Defendants knew or recklessly disregarded that reasonable investors would interpret Defendants' references to an "expanding pipeline" to mean an increasing number of actually plausible sales leads, even though the Company's sales pipeline in fact included many leads that had were not plausible and that not been updated for months.

230.    The 2015 Outlook projected $42 million in revenue and $1.2 in non-GAAP EPS. Ultimately, revenue was *less than $30 million* and non-GAAP EPS was *less than $0.50*. Instead of 40% revenue growth over 2014, revenues actually *decreased*. The sheer magnitude of the miss strongly suggests that Defendants were aware of, or recklessly disregarded, the loss of substantial portions of expected revenue sources.

231.    In fact, the press release announcing the 2015 Outlook bolstered the purported credibility of its revenue and earnings projection by stating that the Company would recognize $25 million in 2015 from contracts signed in 2014. Defendants later assured investors that the 2015 Outlook was based solely on (a) revenues from contracts that had already been signed and (b) "recurring revenue"

that Defendants represented was stable, high-margin, long-term, and predictable. But as investors later learned, that "recurring revenue" included revenue from follow-on contracts that SuperCom had announced in press releases were "new contracts." And $10 million of the expected revenue for the third quarter of 2015 was related to a contract that had not been signed as of November 30, 2015 and does not appear to have been signed even as of today.

232.    Finally, the temporal proximity between Defendants' misrepresentations and the disclosure of the truth strongly suggests that Defendants' statements were knowingly false, or at minimum, reckless when made. Defendants continued to reiterate the 2015 Outlook—and to insist that it was not dependent upon any new contract wins—as late as *September 16, 2015*, even as they became increasingly aware of undisclosed facts that would seriously undermine the reliability of that projection. Only 2 ½ months later, on November 30, 2015, the Company admitted that it would not meet its previously-issued guidance—precisely because the Company had been expecting $10 million in revenues from a contract that had not even been signed yet.

## **LOSS CAUSATION**

233.    During the Class Period, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SuperCom common stock and operated as a fraud or deceit on Class Period purchasers of SuperCom common stock by misrepresenting the value of the Company's business and prospects by overstating its earnings.

Defendants' material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of SuperCom and its business, prospects, and operations. As a result, SuperCom common stock traded at artificially inflated prices during the Class Period.

234.    Lead Plaintiff and other members of the Class purchased or otherwise acquired SuperCom common stock relying upon the integrity of the market price of SuperCom common stock and market information relating to SuperCom.

235.    When the true facts about the Company were revealed to the market, the inflation in the price of SuperCom common stock was removed and the price of SuperCom common stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

## **NO SAFE HARBOR**

236.    The "Safe Harbor" warnings accompanying SuperCom's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability because they failed to identify important factors that could cause actual results to differ materially from those in the forward-looking statements.

237.    To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

238.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of SuperCom who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

239.    Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of SuperCom during the Class Period (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

240.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SuperCom common stock was actively traded on the NASDAQ. While the exact number of Class members can only be ascertained through discovery, Lead Plaintiff believes that there are hundreds or

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SuperCom and/or its transfer agent.

241.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

242.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

243.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether Defendants violated the Exchange Act;

(b)   whether statements made by Defendants misrepresented material facts about the business and operations of SuperCom;

(c)   whether Defendants' conduct caused artificial inflation in the market for the Company's securities; and

(d)   whether the members of the Class have sustained damages, and if so, the proper measure of such damages.

244.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members

of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

245.   Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)   Defendants made public misrepresentations or failed to disclose facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   SuperCom common stock traded in an efficient market;

(d)   The misrepresentations would tend to induce a reasonable investor to misjudge the value of SuperCom common stock; and

(e)   Plaintiff and other members of the Class purchased SuperCom common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

246.   At all relevant times, market for SuperCom common stock was open, well-developed and efficient for the following reasons, among others:

(a)   As a regulated issuer, SuperCom filed periodic public reports with the SEC; and

(b)   SuperCom regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as

communications with the financial press, securities analysts, and other similar reporting services.

## COUNT I

**For Violations of §10(b) of the Exchange Act and Rule 10b-5
Against Defendants SuperCom, Arie Trabelsi, Tsviya Trabelsi, Ordan
Trabelsi, and Simona Green**

247.   Plaintiff incorporates all previous paragraphs by reference.

248.   During the Class Period, the Defendants named in this Count disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

249.   The Defendants named in this Count violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of SuperCom common stock during the Class Period.

250.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SuperCom common stock. Plaintiff and the Class would not have purchased SuperCom

common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

251.   Plaintiff incorporates all previous paragraphs by reference.

252.   The Individual Defendants acted as controlling persons of SuperCom within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of SuperCom common stock, the Individual Defendants had the power and authority to cause SuperCom to engage in the wrongful conduct complained of herein. SuperCom controlled the Individual Defendants and all of the Company's employees. By reason of such conduct, these Defendants are liable under §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Federal Rule of Civil Procedure 23 and plaintiff's counsel as Lead Counsel;

B.   Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 7, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Murielle J. Steven Walsh
600 Third Ave., 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com
          mjsteven@pomlaw.com

**GOLDBERG LAW PC**
Michael Goldberg
Brian Schall
13650 Marina Pointe Dr. Ste. 1404
Marina Del Rey, CA 90292
Telephone: 800-977-7401
Fax: 800-536-0065
Email: michael@goldberglawpc.com
          brian@goldberglawpc.com

*Lead Counsel for Plaintiffs*