UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/10/18_

IN RE: SUPERCOM INC. SECURITIES
LITIGATION

**MEMORANDUM**
**OPINION & ORDER**

15 Civ. 9650 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a consolidated class action brought on behalf of purchasers of Defendant

SuperCom Ltd.'s common stock between January 21, 2015 and November 27, 2015 (the "Class

Period"). (Am. Cmplt. (Dkt. No. 46)) According to the Consolidated Class Action Amended

Complaint (the "Amended Complaint"), SuperCom and certain of its senior officers and

directors issued false and misleading statements in connection with SuperCom's "bold revenue

and earnings projection" for 2015 (id. ¶ 3), which included alleged "misrepresentations about

[SuperCom's] revenue streams and sales pipeline in order to prevent investors from learning the

truth." (Id. ¶ 4) The Amended Complaint asserts claims under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 and SEC Rule 10b–5. (Id. ¶¶ 1, 247-52)

Defendants moved to dismiss the Amended Complaint, pursuant to Federal Rules

of Civil Procedure 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995

(the "PSLRA"). (Def. Mot. (Dkt. No. 59)) Defendants argue that the Section 10(b) claims

should be dismissed because the challenged statements are protected under the PSLRA's safe

harbor for forward-looking statements that are accompanied by meaningful cautionary language.

(Def. Br. (Dkt. No. 61) at 19-23) In the alternative, Defendants contend that the Section 10(b)

claims fail because the Amended Complaint does not plead facts supporting a strong inference of scienter. (Id. at 23-30) Defendants also contend that Plaintiffs' Section 20(a) claims should be dismissed because the Amended Complaint does not allege a primary violation of the Securities Exchange Act. (Id. at 30)

In a September 30, 2018 Order (Dkt. No. 68), this Court granted Defendants' motion to dismiss. In this opinion, the Court sets forth its reasoning for granting Defendants' motion to dismiss.

## BACKGROUND

### I.    FACTUAL BACKGROUND[1]

#### A.    Summary of the Action

SuperCom – an Israeli company with a United States subsidiary, SuperCom Inc., headquartered in New York – is a global provider of "electronic monitoring, identification, and security products . . . to governments and commercial customers, principally in Africa, Eastern Europe, and South America." (Am. Cmplt. (Dkt. No. 46) ¶¶ 23, 30) SuperCom's "core business is the design and development of electronic identity ('EID' or 'SmartID') solutions," which include, inter alia, "biometric passports and visas, automated fingerprint identification systems,

---

[1] The Court's statement of facts is drawn from the allegations in the Amended Complaint. In deciding the motion to dismiss, the Court may also "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "Because the Amended Complaint quotes and relies upon statements made during . . . analyst calls . . . , the Court may properly consider the full transcripts of those calls . . . in connection with the Rule 12(b)(6) motion without converting it to one for summary judgment." Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 232 n.2 (S.D.N.Y. 2009). Where the documents on which the Amended Complaint relies "contradict the allegations of the . . . complaint, the documents control." In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).

[and] digitized driver's licenses." (Id. ¶ 31) However, SuperCom "also provides electronic tracking solutions" through its "PureConnect" solutions, which were previously branded as "active radio frequency identification ('RFID') solutions," and it has recently "begun offering mobile payment solutions under the 'SuperPay' brand." (Id. ¶¶ 32-33) SuperCom's common stock is traded on "certain European stock exchanges," and on the NASDAQ stock exchange in this District. (Id. ¶¶ 20, 23)

On January 21, 2015 – the beginning of the Class Period – SuperCom announced that it "'anticipate[d] revenue growth for the full year ended December 31, 2015 to exceed 40% on a year-over-year basis," which would require approximately $42 million in total revenue, and that it "anticipate[d] non-GAAP [earnings per share] for 2015 to exceed $1.20." (Id. ¶¶ 3, 5, 15 (emphasis omitted)) SuperCom reiterated that projection throughout most of 2015, including on March 26, 2015, when it reported financial results for the full year of 2014; on June 1, 2015, when it reported results for the first quarter of 2015; and on September 16, 2015, when it reported results for the second quarter of 2015. (Id. ¶¶ 4-10)

On November 30, 2015, however, SuperCom disclosed preliminary results for the third quarter of 2015, and reported that "[r]evenue for the quarter was 'anticipated to be in a range of $5.5 million to $6.1 million,'" which was "less than half of the $13.38 million [that SuperCom] had led the investment community to expect." (Id. ¶ 14 (emphasis omitted)) SuperCom also admitted at that time that it "could not meet" its projection of approximately $42 million in revenue for 2015. (Id. ¶ 15) Instead, SuperCom expected only $30 million in revenue. (Id.) SuperCom "blamed the miss on a purported 'inability to recognize more than $10 million of revenues that were expected [in 2015].'" (Id. ¶ 16) As a result of that news,

SuperCom's common stock "plummeted by more than $3, or 40%" by the close of trading on November 30, 2015. (Id. ¶ 18)

The Amended Complaint alleges that SuperCom and several of its officers and directors – including Arie Trabelsi, the President and Chief Executive Officer; Tsviya Trabelsi, the Chairperson of SuperCom's Board of Directors; Ordan Trabelsi, the President of SuperCom of the Americas; Barak Trabelsi, the Vice President of SuperCom's Machine-to-Machine ("M2M") Division; and Simona Green, SuperCom's Chief Financial Officer from August 2014 until November 17, 2015 – violated the Securities Exchange Act through a series of material misstatements and omissions about the current and future financial health of SuperCom.[2] (Id. ¶¶ 23-29) The Class Period ends on November 27, 2015 – three days before the announcement that SuperCom could not meet its projections for 2015. (Id. ¶¶ 1, 3, 18, 93)

The Amended Complaint alleges that Defendants made false and misleading statements in a January 21, 2015 press release; in a March 26, 2015 press release and earnings conference call; in a June 1, 2015 press release and earnings conference call; in a June 18, 2015 supplemental prospectus used in connection with a stock offering; and in a September 16, 2015 press release and earnings conference call. (Id. ¶¶ 3, 5-6, 8-10, 114-16, 121-22, 162, 164-67, 191-96)

**B.**   **Supercom's History**[3]

Supercom was incorporated in Israel in 1988, and began trading publicly on the NASDAQ Europe stock market in 1999. (Id. ¶ 37) In 2004, it became a foreign private issuer

---

[2] Tsviya Trabelsi is Arie Trabelsi's wife, and Ordan and Barak Trabelsi are Arie Trabelsi's sons. (Id. ¶¶ 25-27)

[3] A significant portion of the Amended Complaint is devoted to alleged statements made prior to the Class Period. (See Am. Cmplt. (Dkt. No. 46) ¶¶ 42-92) The Amended Complaint does not assert any claims based on these statements, however, and even if it did, "statements that pre-

reporting company in the United States, and its stock began trading on the Over-the-Counter Bulletin Board. (Id.) In 2007, SuperCom sold its EID division to On Track Innovations Ltd., changed its name to Vuance Ltd., and began to focus on its RFID products. (Id. ¶ 38) On August 23, 2007, Vuance's ordinary shares began trading on the NASDAQ Capital Market. (Id.) Vuance was "not successful," however, and, on October 1, 2009, its securities were delisted from the NASDAQ due to inadequate stockholders' equity. (Id. ¶ 39)

In 2010, SigmaWave – an Israeli private-equity fund owned by the Trabelsi family – acquired a controlling stake in Vuance. (Id. ¶ 40) In 2013, Vuance changed its name back to SuperCom and reacquired its EID division from On Track Innovations. (Id. ¶ 42-47) On September 17, 2013, SuperCom's stock again began trading on the NASDAQ exchange. (Id. ¶ 44)

Beginning in late 2013, SuperCom allegedly developed its "core sales pitch to investors," which it relied upon and expanded throughout the following years. (See id. ¶¶ 50-57, 119) SuperCom marketed itself as having

> (a) rapid short-term growth potential from its sales pipeline, as a single large new contract could suddenly triple [SuperCom's] revenues; (b) steady, predictable, high-margin recurring revenues through established contracts; and (c) long-term growth because every new contract would both provide short-term deployment revenues [and] add to its base of recurring revenues.

(Id. ¶ 119)

In 2014, after the reacquisition of its EID division, SuperCom experienced significant financial growth. For the full year of 2013, SuperCom had reported revenue of only $8.8 million. (Id. ¶ 66) In the first three quarters of 2014, however, SuperCom announced a

---

date the Class Period are not actionable." Wilder v. News Corp., No. 11 Civ. 4947 (PGG), 2014 WL 1315960, at *7 (S.D.N.Y. Mar. 31, 2014) (citing Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153-54 (2d Cir. 2007)).

number of new contracts (id. ¶¶ 64, 66, 68, 74, 76), and reported dramatic revenue growth in each quarter. (See id. ¶¶ 35, 72, 77-78 (reporting $5,308,000 in revenue in the first quarter, $7,056,000 in revenue in the second quarter, and $9,104,000 in revenue in the third quarter)) Although SuperCom's revenue dropped to $8,235,000 in the fourth quarter of 2014, and no new contracts were announced (id. ¶¶ 35, 134; see also Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 313-15),[4] SuperCom's year-over-year revenue had still grown by 237% – from $8.8 million in 2013 to $29.7 million in 2014 – and its non-GAAP earnings per share ("EPS") had risen from $0.21 in 2013 to $0.81 in 2014. (Am. Cmplt (Dkt. No. 46) ¶¶ 127, 192; see also Pressment Decl., Ex. E (March 26, 2015 press release (Dkt. No. 60) at 299)

C.     **The January 2015 Outlook and the Accompanying Cautionary Statements**

On the heels of its 2014 performance, SuperCom issued a press release on January 21, 2015, announcing that it "'anticipate[d] revenue growth for the full year ended December 31, 2015 to exceed 40% on a year-over-year basis and anticipate[d] non-GAAP EPS for [] 2015 to exceed $1.20'" (the "January 2015 Outlook"). (Am. Cmplt. (Dkt. No. 46) ¶ 93 (emphasis omitted); see also Pressment Decl., Ex. C (January 21, 2015 Press Release) (Dkt. No. 60) at 283) In order for SuperCom to meet the January 2015 Outlook, it would require $41.6 million in total revenue and a 50% increase in its non-GAAP earnings per share. (Am. Cmplt. (Dkt. No. 46) ¶ 95)

In the January 2015 press release, Arie Trabelsi stated that,

SuperCom has won new contracts exceeding $60 million during 2014, and more than $25 million of this is expected to be booked during the next nine months, giving [SuperCom] a strong base to start 2015. . . . This new business demonstrates increasing demand for [SuperCom's] e-ID, e-Passport and e-Gate solutions, and we are encouraged by the number, quality and size of opportunities

---

[4] All references to page numbers in this Order are as reflected in this District's Electronic Case Filing system.

we have in our sales pipeline. The progress made during 2014 bolsters our confidence as [SuperCom] head[s] into 2015, and I have never been more optimistic about SuperCom's future. Macroeconomic conditions have not materially impacted the overall market and incremental growth, coupled with [SuperCom's] growing base of multi-year contracts, sets the stage for a strong end to 2014 and an even more robust 2015.

(Pressment Decl., Ex. C (January 21, 2015 press release) (Dkt. No. 60) at 283; see also Am.

Cmplt. (Dkt. No. 46) ¶ 93)

The January 21, 2015 press release also cautioned, however, that,

[s]tatements preceded or followed by or that otherwise include the words "believes", "expects", "anticipates", "intends", "projects", "estimates", "plans", and similar expressions or future or conditional verbs such as "will", "should", "would", "may" and "could" are generally forward-looking in nature and not historical facts. Forward-looking statements in this release also include statements about business and economic trends.

(Pressment Decl., Ex. C (January 21, 2015 press release) (Dkt. No. 60) at 284-85)  The press

release further advised "[i]nvestors [to] consider the areas of risk described under the heading

'Forward Looking Statements' and those factors captioned as 'Risk Factors' in [SuperCom's]

periodic reports under the Securities Exchange Act of 1934," and explained that forward-looking

statements "are subject to known and unknown risks, uncertainties and other factors that may

cause actual results, performance or achievements to be materially different. . . ." (Id. at 285)

All of the other press releases and earnings calls at issue likewise referred

investors to the risk factors listed in SuperCom's periodic SEC filings. (See Pressment Decl.,

Ex. E (March 26, 2015 press release) (Dkt. No. 60) at 294; Pressment Decl., Ex. F (March 26,

2015 earnings call) (Dkt. No. 60) at 304; Pressment Decl., Ex. G (June 1, 2015 press release)

(Dkt. No. 60) at 338; Pressment Decl., Ex. H (June 1, 2015 earnings call) (Dkt. No. 60) at 344;

Pressment Decl., Ex. J (September 16, 2015 press release) (Dkt. No. 60) at 455; Pressment Decl.,

Ex. K (September 16, 2015 earnings call) at 463)

In its periodic SEC filings, SuperCom provided an in-depth description of the many risks that investors should consider before buying SuperCom common stock. (See, e.g., Pressment Decl., Ex. B (2013 Fiscal Year Report) (Dkt. No. 60) at 88-101) The risks cited by SuperCom included the following:

- [T]he expense and delay that may arise if [SuperCom's] competitors protest or challenge new contract awards made to [SuperCom] pursuant to competitive bidding or subsequent contract modifications. (Id. at 90)

- Governmental Contracts subject [SuperCom] to risks associated with public budgetary restrictions and uncertainties, actual contracts that are less than awarded contract amounts, and cancellation at any time at the option of the governmental agency. . . . Furthermore, governmental programs can experience delays or cancellation of funding, which can be unpredictable; this may make it difficult to forecast [SuperCom's] revenues on a quarter-by-quarter basis. (Id. at 91)

- [SuperCom's] operations and performance depend on [its] target customers, including those from the governmental sector, having adequate resources to purchase [SuperCom's] products. . . . Companies and governmental authorities have reduced or delayed and may continue to reduce or delay their purchasing activities in response to a lack of credit, economic uncertainty, budget deficits and concern about the general stability of markets. (Id. at 93)

- Risks inherent to operating in other countries range from difficulties in settling transactions in emerging markets to possible nationalization, expropriation, price controls and other restrictive governmental actions. (Id. at 94)

- [SuperCom's] financial and operating results have fluctuated in the past and could fluctuate in the future from quarter to quarter. As a result of [SuperCom's] dependence on a limited number of customers and [SuperCom's] increased reliance on [its] e-ID, electronic motoring PureRF suite and products, [SuperCom's] revenue has experienced wide fluctuations, and [SuperCom] expect[s] that [its] revenue[s] will continue to fluctuate in the future as [it] integrate[s] the operations of the SmartID Division. (Id.)

- A portion of [SuperCom's] sales is not recurring sales; therefore, quarterly and annual sales levels will likely fluctuate. Sales in any period may not be indicative of sales in future periods. (Id.)

- [T]he period between [SuperCom's] initial contact with a potential customer and the purchase of [SuperCom's] products and services is often long and subject to delays associated with [] budgeting, approval and competitive evaluation

processes . . . . A lengthy sales cycle may have an impact on the timing of [SuperCom's] revenue, which may cause [SuperCom's] quarterly operating results to fall below investor expectations. (Id. at 95)

**D.   Alleged Misleading Aspects of the January 2015 Outlook**

The Amended Complaint alleges that the "guidance in the [January] 2015 Outlook was false and misleading" for multiple reasons. (Id. ¶ 96) First, it alleges that Defendants "repeatedly insisted throughout 2015" that their anticipated financial growth "was based solely on (a) recurring revenues from existing long-term contracts and (b) deployment revenues from contracts that had already been signed," when the projections "in fact depended . . . on the assumption that the Company would sign new contracts." (Id. ¶¶ 101-02)

Second, the Amended Complaint alleges – based on information provided by confidential witnesses – that SuperCom's "vaunted [sales] 'pipeline' . . . had an ineffective revenue forecasting process that made it impossible for it to provide reliable revenue guidance that had a reasonable basis." (Id. ¶ 103) Confidential Witness 2 – a regional director of sales at SuperCom from August 2015 to April 2016 – states that "'95 percent of the leads coming in to [SuperCom] were just blah, blah, blah,'" and "'not real leads.'" (Id. ¶ 104) Confidential Witness 2 also states that SuperCom did not have a "clear strategy," but instead "'chased every tender worldwide,' ranging from $50,000 to several million dollars.'" (Id. ¶ 105) Confidential Witness 3 – a "business development manager in SuperCom's Geographical Information Sales ('GIS') department from March 2015 to December 2015" – allegedly witnessed "the GIS department submit[] tens of leads to the pipeline, ranging up to $100 million but mostly worth between $1 million and $5 million," and "[h]e believed that SuperCom had 'no chance' at many of them," other than a $750,000 contract that he believed SuperCom "had a strong chance of closing." (Id. ¶ 106)

Confidential Witness 2 also asserts that SuperCom's pipeline was just "'a very simple Excel spreadsheet'" that lacked a "written policy about what information must be included with each lead in the pipeline." (Id. ¶ 107) SuperCom's sales staff could add tenders without "doing much work to determine if SuperCom could legitimately obtain and service them," and "simply had to list the name of the tender, the customer, a description of the job, the products to be delivered, and the value." (Id.) According to Confidential Witness 3, potential leads were only removed from the sales pipeline when "the underlying tender or project [was] cancelled or given to a competitor." (Id. ¶ 108) Confidential Witness 2 states that SuperCom's policies regarding this spreadsheet were in "stark contrast with Confidential Witness 2's previous work experience at another company, where (a) the sales pipeline was a more detailed database, (b) salespersons were required to maintain estimates for the probability of each lead's potential to close and to update them regularly, and (c) leads could not be added to the pipeline unless they had a certain probability of success." (Id. ¶ 107)

The Amended Complaint alleges that Arie Trabelsi was aware of the pipeline's deficiencies because, according to Confidential Witnesses 3, "each department submitted a weekly spreadsheet to [Arie Trabelsi] listing all potential sales leads and then presented them at a weekly sales meeting." (Id. ¶ 109) Confidential Witness 2 added that this weekly sales meeting was attended by Arie Trabelsi "most of the time." (Id. ¶ 110) Confidential Witness 3 also states that, "Arie Trabelsi was 'very central' and was updated immediately if something was going wrong with a potential lead." (Id. ¶ 111)

The Amended Complaint further alleges that it was false and misleading for SuperCom to assert that it would "recognize at least $25 million in revenues in 2015 from contracts signed in 2014." (Id. ¶ 112) SuperCom's revenue recognition policy, as set forth in its

2014 SEC Form 20-F, states that revenues from product sales and services are only recognized "when persuasive evidence of an agreement exists, services have been rendered or delivery of the product has occurred, the fee is fixed or determinable, collectability is reasonably assured, and inconsequential or perfunctory performance obligations remain." (Pressment Decl., Ex. B (2013 Fiscal Year Report) (Dkt. No. 60) at 123; see also Am. Cmplt. (Dkt. No. 46) ¶ 114) Pursuant to that policy, SuperCom was allegedly unlikely to recognize the entire $25 million in revenues, because, according to Confidential Witness 1 – a member of SuperCom's Information Technology support team until January 2016 – "many of SuperCom's contracts imposed steep penalty fees for late deliveries," and "SuperCom's deliveries were [] late 'all the time.'" (Am Cmplt. (Dkt. No. 46) ¶ 115) "For example, products that should have been delivered to Zambia in mid-2015 had not been delivered as of January 2016." (Id.) Confidential Witness 1 also states that "Arie Trabelsi was fully aware of SuperCom's inability to make timely deliveries because he received daily reports from the research and development team," and that SuperCom had "fired Zeev Greenberg, the manager of research and development, because of this timeliness problem." (Id. ¶ 116) The Amended Complaint also alleges that SuperCom's untimely deliveries were only one part "of a broader problem: many of SuperCom's customers were not happy with its products and services," as exemplified by the decisions of Ecuador and Panama not to renew their contracts in 2015. (Id. ¶ 117)

Finally, the Amended Complaint alleges that Defendants "failed to disclose essential information regarding the assumptions underlying the [January] 2015 Outlook such that investors could understand the basis for and limitations of the projections." (Id. ¶ 118) Specifically, a central component of SuperCom's "core sales pitch" – that it had "steady, predictable, high-margin recurring revenues" – was allegedly misleading, because

11

until specifically requested to do so by the [SEC] on September 30, 2015, Defendants failed to disclose information that could enable investors to determine how much of [SuperCom's] revenues were from (i) new deployments that could conceivably result in a long-term base for recurring revenues in the future, (ii) the high-margin recurring revenues that can provide a stable "nice margin of safety" for investors, or (iii) follow-on contracts that tend to be short-term and unpredictable and are also unlikely to result in a new source of long-term recurring revenues.[5]

(Id. ¶ 122)

According to the Amended Complaint, "the very concept of 'recurring revenues' implies revenue that is highly likely to continue in the future and is thus predictable." (Id. ¶ 120) SuperCom, however, allegedly "counted revenue from existing customers as 'recurring revenues,' even if that revenue was from a follow-on contract," which "may not be truly recurring." (Id. ¶¶ 121, 125 (internal quotation marks and citation omitted); see also id. ¶ 121 ("[T]he revenue from a follow-on contract may not be 'truly recurring revenue because follow-on contracts tend to be a year or less in length' and 'the amount and timing of follow-on orders can be unpredictable.'") (quoting Jay Yoon, Supercom's Q3 Results Confirm Key Points of My Bear Thesis, Seeking Alpha (Nov. 14, 2014), https://seekingalpha.com/article/2635825-update-supercoms-q3-results-confirm-key-points-of-my-bear-thesis#.))

**E.      The March 2015 Press Release and Earnings Conference Call**

SuperCom's March 26, 2015 press release announced its financial results for 2014 and reiterated the January 2015 Outlook. (Id. ¶¶ 126-27, 129; see also Pressment Decl., Ex. E (March 26, 2015 Press Release) (Dkt. No. 60) at 292) For the full year of 2014, SuperCom reported revenue of $29.7 million and non-GAAP EPS of $0.81, which were significant

---

[5] The Amended Complaint also alleges that SuperCom's February 10, 2014 and April 23, 2014 press releases "treat[] follow-on contracts as if they were 'new' contracts." (Am. Cmplt. (Dkt. No. 46) ¶ 124) Both of these press releases pre-date the Class Period, however, and are therefore not actionable. Wilder, 2014 WL 1315960, at *7.

increases over the $8.8 million in revenue and $0.21 EPS for 2013. (Pressment Decl., Ex. E (March 26, 2015 press release) (Dkt. No. 60) at 292) In the March 26, 2015 press release, Arie Trabelsi stated that,

> 2014 was a truly transformative year for Supercom, highlighted by significant year-over-year growth, strong cash flows, and an expanding base of recurring revenue. . . . We completed the integration of the SmartID division that we acquired in December 2013 . . . and strengthened our position in the E-ID market. We enter 2015 with a strong backlog, enhanced visibility for the future, and growing confidence that we have the right solutions, at the right time, in the right markets.

(Id.)

Later that day, Arie Trabelsi, Simona Green, and Ordan Trabelsi held an earnings conference call with analysts. (Am. Cmplt. (Dkt. No. 46) ¶ 130; Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 303) In his opening remarks, Ordan Trabelsi stated that "[w]e continue to be encouraged by the number, quality and size of opportunities we have in our sales pipeline." (Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 306; see also Am. Cmplt. (Dkt. No. 46) ¶ 131) Ordan Trabelsi also stated that SuperCom had begun pursuing "even larger tenders" and had a "large amount of open proposals in various stages and many countries around the globe," and that SuperCom "believe[d] [it was] well positioned to exceed [its] stated goal to secure at least two to three contracts in 2015." (Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 307; see also Am. Cmplt. (Dkt. No. 46) ¶ 131) Ordan Trabelsi also discussed how new contracts impacted SuperCom's future revenues, stating, "[o]n average, we will generate between 20% and 30% of the total deployment contract value as recurring revenue every year." (Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 306) Finally, Ordan Trabelsi discussed SuperCom's growth and potential for increased revenues within the EID, RFID, and Mobile Pay markets, and stated:

We have been in discussions with several potential customers in the U.S., Europe and Asia who have issued tenders . . . rang[ing] in size from 100 units to tens of thousands of units, [with units valued] between $1,000 and $2,000, up to $3,000. And we believe we are well positioned to secure new contract wins in 2015.

(Id. at 307; see also Am. Cmplt. (Dkt. No. 46) ¶ 131)

Later in the call, Arie Trabelsi "reiterated" the January 2015 Outlook – specifically the expectation that revenue growth "would exceed 40% or $42 million" and that non-GAAP EPS would "exceed $1.2 per share" – and opened the call to questions from analysts. (Am. Cmplt. (Dkt. No. 46) ¶¶ 132, 134; see also Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 310)  In response to questions regarding how SuperCom's "optimistic guidance" could be reconciled with its "low fourth-quarter revenue and lack of new contract announcements" (Am. Cmplt. (Dkt. No. 46) ¶¶ 134, 136), Arie Trabelsi stated that the opportunities in the pipeline were "just amazing"; that the analysts could be "confident that we have all the information in hand to support these numbers [that] we believe [for] revenue and margin"; and that he "believe[d] that in the near future [SuperCom would] be able [to] announce some contracts that are larger[,] in the $7 million attritional [sic] in the market." (Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 313)  Arie Trabelsi added, however, that SuperCom had better visibility into its revenues for a given year than for a particular quarter, because its quarters were more susceptible to fluctuations.  (See id. at 314 ("When you deal with [a] governmental agency and when you deal with some of the public expansion, they have their own time to make the decision. . . .  So I view that more to concentrate on a year revenue or look at year over year because, it may be a fluctuation on [a] quarter[ly] [basis] . . . ."))

Arie Trabelsi also stated that SuperCom had "a few large proposals out there," and was "very close to hav[ing] a large contract awarded in November[] [or] December [of 2014], which [it] believe[d] was just a delay," and that Supercom "believe[d] that it should be []

confident in the user in just 90 days." (Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 313; see also Am. Cmplt. (Dkt. No. 46) ¶ 136) Arie Trabelsi further stated that "the upside [could] be huge" on these proposals because they could reach $200 million, which would double the revenue SuperCom expected for the year. (Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 314; see also Am. Cmplt. (Dkt No. 46) ¶ 138) Ordan Trabelsi added that SuperCom was "progressing well in large and small contracts" and saw the "same level difficulty in winning either." (Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 314; see also Am. Cmplt. (Dkt. No. 46) ¶ 138)

Arie Trabelsi later clarified that none of the anticipated contracts wins mentioned on the call had factored into the January 2015 Outlook. (Am. Cmplt. (Dkt No. 46) ¶¶ 141-42; see also Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 329) Ordan Trabelsi also reiterated that there was $25 million – out of the $60 million of contracts awarded in 2014 – that was to be recognized within the "first nine months of 2015." (Am. Cmplt. (Dkt No. 46) ¶ 140; see also Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 318-19)

The Amended Complaint alleges that statements Defendants made on the March 26, 2015 earnings call were false and misleading because (1) for the same reasons Defendants had no reasonable basis to issue the January 2015 Outlook, Defendants had no reasonable basis for reiterating that outlook (Am. Cmplt. (Dkt. No. 46) ¶ 133); (2) Supercom "did not 'have all the information in hand to support these numbers'" (id. ¶ 139); and (3) Supercom "was not 'progressing well in large and small contracts.'" (Id.)

The Amended Complaint also alleges that "[a]nalysts responded positively to these statements." (Id. ¶ 143) For example, on March 27, 2015, Feltl and Company's Joshua J.

Elving described SuperCom as "'well positioned to take advantage of significant opportunities in'" EID, RFID, and Mobile Payments, and he gave SuperCom a "'STRONG BUY rating and $16 target.'" (<u>Id.</u> ¶ 144)

**F.      <u>The June 2015 Press Releases and Earnings Conference Call</u>**

On June 1, 2015, SuperCom issued a press release announcing its financial results for the first quarter of 2015.  (<u>Id.</u> ¶ 146; Pressment Decl., Ex. G (June 1, 2015 press release) (Dkt. No. 60) at 337)  SuperCom announced that, compared to the first quarter of 2014, its revenue had increased by 45% from $5.3 million to $7.7 million, and its non-GAAP EPS had increased by 77% from $0.13 to $0.23.  (Pressment Decl., Ex. G (June 1, 2015 press release) (Dkt. No. 60) at 337)

In the June 1, 2015 press release, Arie Trabelsi stated that SuperCom was "increasingly excited about [its] pipeline of opportunities, which [had] continued to grow as [SuperCom] advanced a number of important tenders during the quarter." (<u>Id.</u>)  He added that, "[i]n the M2M[] arena, more and more government agencies and organizations in the Americas, Europe, and Asia ha[d] selected and decided to adopt SuperCom's Electronic Monitoring solution, creating brand recognition and driving growth in [SuperCom's] pipeline." (<u>Id.</u>)  SuperCom also reported in the June 2015 press release that "[t]he Q1 results [we]re in-line" with the projections in the January 2015 Outlook.  (<u>Id.</u>)

The Amended Complaint alleges that the June 1, 2015 press release was false and misleading because SuperCom lacked the capabilities to accurately forecast whether it would be able to meet the expectations in the January 2015 Outlook.  (Am. Cmplt. (Dkt. No. 46) ¶ 149)  The Amended Complaint also alleges that "SuperCom's 'pipeline of opportunities' had not 'continued to grow'"; that "SuperCom had not 'advanced a number of important tenders during

the quarter'"; and that "SuperCom was not on track to achieve such revenue and earnings growth." (Id.)

After issuing the June 1, 2015 press release, SuperCom held an earnings conference call, during which both Arie Trabelsi and Ordan Trabelsi reiterated the January 2015 Outlook. (Am. Cmplt. (Dkt. No. 46) ¶¶ 150, 152, 154; Pressment Decl., Ex. H (June 1, 2015 earnings call) (Dkt. No. 60) at 345) Ordan Trabelsi began the earnings call by stating that SuperCom "executed well in the first quarter in accordance with [its] business plan." (Pressment Decl., Ex. H (June 1, 2015 earnings call) (Dkt. No. 60) at 345) He went on to announce that "so far in 2015 [SuperCom had] been notified by several government agencies that [it had] been selected as the bidder of choice for a number of [] competitively bid contracts," and was "in negotiations with potential customers now." (Id. at 346) Later in the call, Arie Trabelsi clarified what being selected as the bidder of choice means:

> [I]t effectively [means] that you are the best bidder in terms of technology and your offering, your solution, your proposal. Different probabilities are associated with different tenders, some tenders that very likely means that you are going to turn [it] into [a] contract and others there are more moving parts and more difficulties associated with it, so it's hard to give just a general number.

(Id. at 353; see also Am. Cmplt. (Dkt. No. 46) ¶ 155)

Ordan Trabelsi also discussed SuperCom's "conservative approach" for announcing new contracts during the call, stating:

> As a general practice we announce new wins once a new contract is signed and/or a significant milestone achieved grants us high confidence in future revenues. Taking a conservative approach announcing new wins is a best practice and helps us as a Company avoid risk should a contract be delayed or negotiations break down. This is typical for large government contractors so as to maintain . . . appropriate expectations with our shareholders. I will say that as we move through 2015 our optimism has only increased and we remain confident in our ability to achieve our full year outlook.

(Pressment Decl., Ex. H (June 1, 2015 earnings call) (Dkt. No. 60) at 346; see also Am. Cmplt.

(Dkt. No. 46) ¶ 152)  When Ordan Trabelsi was asked why SuperCom was taking a conservative

approach and not raising its guidance, despite the anticipated contract wins, he responded:

> We like to take into account that we have very high visibility for [] wins in 2014
> that are being deployed, recurrent revenues and other things. There are very large
> vendors out there and some were performing very well off and when those are, if
> and when those are finalized we will announce those and that will exceed our
> guidance first, so we don't take guidance into account at this stage.

(Pressment Decl., Ex. H (June 1, 2015 earnings call) (Dkt. No. 60) at 353-54; see also Am.

Cmplt. (Dkt. No. 46) ¶ 156)

During the June 1, 2015 call, Arie Trabelsi stated that he did not see "any reason

to reduce" SuperCom's long-term goal of achieving sales that would exceed $100 million in the

upcoming years – a goal that he had announced during a November 3, 2014 earnings conference

call, before the Class Period.  (Am. Cmplt. (Dkt. No. 46) ¶ 157; Pressment Decl., Ex. H (June 1,

2015 earnings call) (Dkt. No. 60) at 357)

According to the Amended Complaint, the statements made by Ordan Trabelsi

and Arie Trabelsi during the June 1, 2015 earnings call were false and misleading, because they

were "aware of SuperCom's inability to forecast revenues due to the deficiencies in its

forecasting process."  (Am. Cmplt. (Dkt. No. 60) ¶¶ 153, 158)

In response to the announcements and earnings call, the price of SuperCom shares

rose on June 1, 2015, closing up 12% at $12.09, on unusually high trading volume.  (Id. ¶ 159)

On June 10, 2015, SuperCom issued another press release, announcing that it had

been "selected to implement new contracts representing more than $7 million," and that it

"expect[ed] the majority of the revenue . . . to be recognized within the next 2 quarters."  (Id. ¶

160) The press release also stated that there was "potential for additional follow-on orders in the future as is commonly realized with these types of solutions." (Id. (emphasis omitted))

### G.    The June 2015 Public Offering

On June 17, 2015, SuperCom issued a press release announcing an underwritten public offering of 2.415 million shares, pursuant to a previously-filed shelf registration statement that had become effective on July 25, 2014. (Id. ¶¶ 162, 167) On June 18, 2015, SuperCom priced the offering at $12 per share. (Id. ¶ 163) In the supplemental prospectus for the public offering, SuperCom disclosed the same risk factors that are set forth in its periodic SEC filings. (See Pressment Decl., Ex. I (June 18, 2015 Supplemental Prospectus) (Dkt. No. 60) at 418-32)

The Amended Complaint alleges that the supplemental prospectus was false and misleading because SuperCom did not disclose that most of its "recurring revenues" were from "newly-signed follow-on contracts with existing customers" – which are "shorter-term and less predictable than truly recurring revenue" – which meant that SuperCom did not have a reasonable basis to conclude that it was on track to meet the January 2015 Outlook. (Am. Cmplt. (Dkt. No. 46) ¶¶ 164-65) The Amended Complaint does not allege that the supplemental prospectus contains fraudulent statements separate and apart from the January 2015 Outlook, however.

On June 23, 2015, SuperCom announced that it had successfully sold all 2.415 million shares, raising $29 million. (Id. ¶ 167)

### H.    September Press Release and Earnings Conference Call

On September 16, 2015, SuperCom issued a press release announcing its financial results for the second quarter of 2015. (Id. ¶ 168; Pressment Decl., Ex. J (September 16, 2015 press release) (Dkt. No. 60) at 454) SuperCom announced that, in the first six months of 2015,

"[r]evenue increased by 24% to $15.4 million compared to $12.4 million" in 2014, and that, in the second quarter of 2015, "revenue increased by 10% to $7.75 million compared to $7.06 million" in 2014. (Pressment Decl., Ex. J (September 16, 2015 press release) (Dkt. No. 60) at 454) SuperCom also reported that, in the first six months of 2015, "[n]on-GAAP EPS increased by 15% to $0.38 compared to $0.33" in 2014, but that, in the second quarter of 2015, non-GAAP EPS had fallen to "$0.16 compared to $0.20" in 2014. (Id.) Accordingly, SuperCom's second quarter financial results were not on track to meet the January 2015 Outlook. (Am. Cmplt. (Dkt. No. 46) ¶ 168)

In an alleged "[a]ttempt to mitigate the inevitable stock price drop" (id. ¶ 169), Arie Trabelsi stated in the September 16, 2015 press release that SuperCom "recognized nearly $2 million of high-margin revenues that [it] expected to recognize in late June, during the first weeks of July, shortly after the [second] quarter closed." (Pressment Decl., Ex. J (September 16, 2015 press release) (Dkt. No. 60) at 454)

Arie Trabelsi also stated in the press release that SuperCom had "executed according to plan in the second quarter, achieving revenue growth and strong margins while dramatically broadening [its] new business pipeline and solutions offerings in [its] fast growing target markets." (Id.) Arie Trabelsi further stated that SuperCom "executed on a number of strategic and operational initiatives including securing more than $7 million in follow on orders from existing e-ID customers [and] winning a highly strategic electronic offender monitoring tender with a new European government customer and strengthening our balance sheet by raising approximately $27 million net proceeds from a successful public offering." (Id.)

Arie Trabelsi added that "[t]he number, quality, stage and size of opportunities in our pipeline are increasingly encouraging," and that, "[b]ased on the number of open proposals

we have around the globe in various stages and in light of our strengthened balance sheet following the successful offering, we believe we are well positioned to win additional new contracts this year." (Id.) Arie Trabelsi ended by stating that, "[w]ith a growing base of recurring revenues and increasing demand for [SuperCom's] solutions, [he] believe[d] [that SuperCom would] meet the guidance previously issued." (Id.)

The Amended Complaint alleges that these statements were false and misleading because Arie Trabelsi was "aware of Supercom's inability to forecast revenues due to the deficiencies in its forecasting process, and therefore, was in no position" to determine whether SuperCom could meet the January 2015 Outlook. (Am. Cmplt. (Dkt. No. 46) ¶ 171)

Later that day, SuperCom held an earnings conference call. (Id. ¶ 172; Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 462) In his opening remarks, Ordan Trabelsi stated that, although the recognition of $2 million in revenue had been delayed, SuperCom did not believe that the delay would "have an impact on [SuperCom's] full year financials." (Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 465; see also Am. Cmplt. (Dkt. No. 46) ¶ 173) Ordan Trabelsi then described the status of SuperCom's sales pipeline, addressing each division of the Company. (Am. Cmplt. (Dkt. No. 46) ¶ 174)

For SuperCom's EID division, Ordan Trabelsi stated that

the number of advanced stage tenders in our pipeline continues to increase and we are in negotiations with several potential customers for contracts where we have been selected as the bidder of choice. Some of these potential contracts are significantly larger than what we've seen in the past and require more working capital.

(Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 466)

With respect to SuperCom's M2M division, Ordan Trabelsi stated that its

M2M pipeline also continues to advance. Currently we are in discussions with several potential customers in the U.S., Latin America, Europe and Asia with issue of tenders and we have actively progressed in the public safety segment. These tenders range in size from annual recurring revenues of hundreds of thousands of dollars to tens of millions of dollars. Given our progress and communication with government customers, we are expected to secure additional new contract wins this year. And as was the case of the win we announced in July, these new contracts will allow us to bid much more effectively and rapidly [increase] revenues in upcoming years.

(Id. at 466-67)

Arie Trabelsi then reiterated the January 2015 Outlook:

As a reminder, our quarterly results are highly dependent on the relative amount of contracts related to larger formal contracts and completion [of] revenue recognition which can lead to quarterly lumpiness that we experienced during the second quarter. On an annual bas[is] however and as a result of growing too much recurring revenue from existing customers, our business is surely predictable and as a result we believe we're able to effectively forecast annual guidance. . . . I believe we will meet the guidance previously issued.

(Id. at 468-69)

SuperCom then opened the call to questions from analysts. (Id. at 469) In response to a question about the lack of new "material" contract announcements and the status of SuperCom's sales pipeline, Ordan Trabelsi stated:

[O]our processes we believe only improved in terms of amount of [indiscernible] we've been able to add with our enhanced team over time to be more effective in how we bid on things and how we gather the intelligence necessary for bidding on proposals. What has changed strategically which might have a small impact on longer time schedules is the size of the tenders. We are increasingly looking at larger and larger tenders and they sometimes do take a bit longer to turn into a final contract, especially from when you get actual win. But generally speaking in this business, sometimes you have periods of time [when] we have a lot of wins that are close together and other times a bit more spread out. But on a statistical trend when we look at, we are only increasing our capability to win more of these projects. And we expect that when you average it over time, you will see much larger contract wins and revenues associated with them in [the] upcoming, near future.

(Id. at 469-70; see also Am. Cmplt. (Dkt. No. 46) ¶ 179) Ordan Trabelsi added, however, that "[t]hings always do fall out of the pipeline and other things come to replace them. I would say that the opportunities we have been mostly excited about have stayed in and we still feel good about them." (Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 470; Am. Cmplt. (Dkt. No. 46) ¶ 180)

When asked how SuperCom could have such a high degree of confidence in the bullish January 2015 Outlook so late into the year, Arie Trabelsi and Ordan Trabelsi reiterated that SuperCom's forecasting abilities were better suited and more meaningful with respect to annual, rather than quarterly, results. (Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 473; Am. Cmplt. (Dkt. No. 46) ¶ 182) Arie Trabelsi also stated that he remained "comfortable with our earlier projection this year for the five years' plan and in some cases I think we feel that we achieve it even faster than we expected." (Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 478; Am. Cmplt. (Dkt. No. 46) ¶ 183)

When asked about contracts that SuperCom expected to win by the end of 2015, Ordan Trabelsi stated: "There are some projects that we've already been awarded and they give us more confiden[ce] than others[,] but there is still a process between award's actual signing and starting of the contract which can take a variable amount of time." (Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 470; Am. Cmplt. (Dkt. No. 46) ¶ 185) Ordan Trabelsi later reiterated that SuperCom is conservative in its announcement of contracts, stating:

> [SuperCom's] general methodology is to announce the contracts once they're signed or another – very high confidence makes us believe that the projects will start. Even though there's several [indiscernible] for that, we actually win or selected, we take a conservative approach and only announce once [] we're at the "final stage" and actually starting a deployment.

(Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 478; Am. Cmplt. (Dkt. No. 46) ¶ 186)  When asked for a timeline for closing contracts that were discussed on the call, Arie Trabelsi refused to provide exact dates, explaining that delays caused by competition, geopolitics, and the size of the contracts were possible.  (Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 479)

Later in the call, an analyst asked whether the January 2015 Outlook included "any potential new business that you see with [a] high visibility of closure" or was "strictly on business that [SuperCom has] already."  (Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 484; Am. Cmplt. (Dkt. No. 46) ¶ 187)  Arie Trabelsi responded that

> [t]he confidence which is reflected in our press release about securing more contract[s] is just based on what we have right now in hand in different stages on different tenders. . . . I would say that some of the revenue recurring, some of them are from new contracts, but most of them are recurring contracts that we have in hand.  For example, we have a contract that is over $15 million as we [were] already selected as the bidder of choice and we had a major progress. We're preparing it for delivery and it just got delayed because of some [indiscernible] in the country itself.  We believe that at the end of the day the country needs this solution and because we are being selected, they will sign a contract and we are able to deliver it.

(Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 484; Am. Cmplt. (Dkt. No. 46) ¶ 187)

Ordan Trabelsi added that SuperCom had "deployments from 2014 that are expected at churn level to be recognized in [20]15 which we've given in our guidance," but that the bigger projects that had been discussed "are not included and will be above what we gave as original guidance when we built it out."  (Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 484; Am. Cmplt. (Dkt. No. 46) ¶ 187)

Towards the end of the call, Ordan Trabelsi stated:

We do have all the right signals from the market to give us high confidence that we are in the right way. And that could be even the small things as many other players coming to us and large tenders are out and asking for us to partner with them. So some of the players that are in the market they see our success in the tenders and our capabilities are growing. And soon when we are at the stage, we will announce properly to the market and you know that with our conservative approach we have taken all the rights steps to ensure that our announcement actually comes into highly predictable future generation of revenues and profitability at a high margin.

(Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 488; Am. Cmplt. (Dkt. No. 46) ¶ 187)

The Amended Complaint alleges that the remarks made by Arie Trabelsi and Ordan Trabelsi on the September 16, 2015 earnings call were false and misleading because SuperCom did not have the capabilities to forecast its future financial results. (Am. Cmplt. (Dkt. No. 46) ¶ 178)  It also alleges that these statements "had their intended effect" because "the price of SuperCom stock declined only moderately from its close of $9.04 on September 15, 2015 [by] closing at $8.31 on September 16, 2015," when it should have fallen much further.  (Id. ¶ 190)

## I.    The September 30, 2015 SEC Letter

On September 30, 2015, the SEC sent a letter to SuperCom regarding its 2014 Form 20-F, which was filed on April 13, 2015, demanding that SuperCom's future filings "provide more detailed explanations as to changes in [SuperCom's] mix of revenue and the resulting impact on [SuperCom's] gross margin." (Id. ¶ 191)  The SEC's letter noted that the Company's 2014 Form 20-F stated that SuperCom had

> generated revenues from "deployments under contracts with new customers and relationships acquired via the SmartID acquisition," but did not specify "the amount of change attributable to new customers, the number of new customers, [] the amount attributable to the relations [SuperCom] acquired[,]" . . . the additional revenue from deployments related to partial deployments[,] or "how much deployment remain[ed] on those projects."

(Id. ¶ 195) The SEC further noted that SuperCom had "failed to 'clarify how [the] mix of revenues changed such that gross margin was impacted." (Id. (brackets in original)) The SEC "demanded that future filings, 'similar to the discussion during management's fourth quarter earnings call, describe the proportion of revenues generated from new contract deployment and the proportion of revenues categorized [as] recurring, such as consumables, maintenance and licenses, and the impact that proportion had on gross margin.'" (Id. ¶ 196)

SuperCom responded that it would comply in future filings, and SuperCom's 2015 Form 20-F included more details concerning the sources and proportions of the Company's revenues. (See id. ¶¶ 197, 199)

**J.    The Announcements in November 2015 and the Resulting Price Drop**

On November 17, 2015, SuperCom announced that Simona Green – its chief financial officer ("CFO") – would be leaving the Company, and that the former controller and Vice CFO, Shahar Marom, would become acting CFO. (Id. ¶ 200) Simona Green was the third CFO to leave SuperCom in three years. (Id. ¶ 202) In the same press release, SuperCom announced that it would be replacing its chief information officer. (Id. ¶ 200) That same day, SuperCom announced that it had acquired a cybersecurity company, Prevision Ltd. (Id.) Supercom's stock price dropped 9.7% on November 17, 2015, closing at $7.90. (Id. ¶ 201)

On November 30, 2015, SuperCom announced its preliminary financial results for the third quarter. (Id. ¶ 203; Pressment Decl., Ex. L (November 30, 2015 press release) (Dkt. No. 60) at 495) SuperCom stated that it anticipated revenue for the third quarter "to be in a range of $5.5 million to $6.1 million," which was significantly less than the $13.38 million that SuperCom needed to be on track to fulfill the January 2015 Outlook. (Pressment Decl., Ex. L (November 30, 2015 press release) (Dkt. No. 60) at 495; Am. Cmplt. (Dkt. No. 46) ¶ 204)

26

Accordingly, SuperCom revised its forecast, stating that it "believe[d] that revenue for the full year w[ould] exceed $30 million," and that "EBITDA [earnings before interest, tax, depreciation, and amortization] for the full year of 2015 w[ould] exceed $9 million." (Pressment Decl., Ex. L (November 30, 2015 press release) (Dkt. No. 60) at 495; Am. Cmplt. (Dkt. No. 46) ¶ 205)

In the November 30, 2015 press release, Arie Trabelsi explained the revised outlook as follows:

> Our financial performance in the third quarter and full-year were impacted by our inability to recognize more than $10 million of revenues that were expected this year, mainly due to delays associated with foreign government customers. . . . This delay, while inherent in our business, is frustrating, but we believe we will be able to recognize this revenue in 2016. As a result of these delays, we are adjusting our full-year outlook. Our confidence in our continued growth in 2016 and beyond remains intact. We continue to be successful in identifying, bidding upon and winning business. Our quarterly results can be erratic based on complex revenue recognition challenges, but nothing that has occurred has changed our medium and long-term outlook.

(Pressment Decl., Ex. L (November 30, 2015 press release) (Dkt. No. 60) at 495; Am. Cmplt. (Dkt. No. 46) ¶ 206)

Later that day, SuperCom announced that it had been "awarded new contracts, totaling approximately $8 million," and that it "expect[ed] to deliver and recognize the full value of the orders during the first half of 2016." (Am. Cmplt. (Dkt. No. 46) ¶ 207) The press release did not disclose the customers who had entered into the new contracts, but the Amended Complaint claims that these contracts are with existing customers.[6] (Id.)

After issuing the November 30, 2015 press release, SuperCom held an earnings conference call regarding its third quarter financial results and revised outlook. (Id. ¶ 208;

---

[6] During the November 30, 2015 earnings call, Marom confirmed that "some of the $8 million" was in "the bucket of existing customer revenues." (Pressment Decl., Ex. M (November 30, 2015 earnings call) (Dkt. No. 60) at 509)

Pressment Decl., Ex. N (November 30, 2015 earnings call) (Dkt. No. 60) at 498) Arie Trabelsi opened the call by stating that the revised outlook had resulted "[m]ostly" from "delays associated with foreign government process and approval," which had impacted SuperCom's ability to recognize more than $10 million in revenue. (Pressment Decl., Ex. N (November 30, 2015 earnings call) (Dkt. No. 60) at 500; Am. Cmplt. (Dkt. No. 46) ¶ 209) Arie Trabelsi also stated, however, that SuperCom's "underlying fundamentals remain intact," and that "the vast majority of late stage opportunities [SuperCom had] still . . . remained open in the pipeline." (Pressment Decl., Ex. N (November 30, 2015 earnings call) (Dkt. No. 60) at 499, 501; Am. Cmplt. (Dkt. No. 46) ¶ 209)

Later in the call, Marom and Arie Trabelsi discussed the delayed recognition of more than $10 million in the third quarter of 2015. They explained that SuperCom had expected to recognize a particular contract in 2015, but that it had not been signed by November 30, 2015. (Id. at 508, 513) Marom "still believe[d]," however, "that this contract w[ould] be mature and [] be deployed in 2016." (Id. at 508) Marom stated that the delayed recognition of the $10 million contract "ha[d] to do with the delay with the contract," but he attributed the issue "mostly" to "the transition with our Chief Financial Officer position." (Id. at 511)

During this call, Ordan Trabelsi distinguished between revenue obtained from new and existing customers, as the SEC had demanded in its September 30, 2015 letter. (Am. Cmplt. (Dkt. No. 46) ¶ 211; Pressment Decl., Ex. M (November 30, 2015 earnings call) (Dkt. No. 60) at 501-02) He stated that SuperCom's EID's division is "split into two main categories, the first is new deployment[s], contracts we won from new customers," and "[t]he second is revenues from our existing customers which are in the post deployment stage or in the steady-state." (Id. at 501-02) He added that SuperCom "recognized a bit less than $12 million from

steady-state customers" in 2014, but that he "expect[ed] this stream of revenue to exceed $15 million in 2015." (Id. at 502) According to the Amended Complaint, the use of the phrase "steady-state" revenues represented a departure from Defendants' prior practice of referring broadly to "recurring revenues" without elaboration. (Am. Cmplt. (Dkt. No. 46) ¶ 211)

Finally, when asked whether SuperCom could achieve its revised expectations for 2015 – which would require fourth quarter revenues of at least $9 million – Marom responded that he "believe[d] that [SuperCom had] all the full confidence to recognize in full and everything else is just going to be an upside too." (Pressment Decl., Ex. M (November 30, 2015 earnings call) (Dkt. No. 60) at 508-09; see also Am. Cmplt. (Dkt. No. 46) ¶ 212)

Analysts were disappointed with SuperCom's failure to meet the January 2015 Outlook, and some lowered their target price for SuperCom's stock. (See Am. Cmplt. (Dkt. No. 46) ¶¶ 213-14) By close of business on November 30, 2015, SuperCom's common stock had fallen more than 40%, from $7.70 to $4.60, after unusually high levels of trading. (Id. ¶ 215)

According to the Amended Complaint, Defendants' alleged "misstatements and omissions" had created an "unrealistically positive assessment of SuperCom and its business, prospects, and operations," which had caused SuperCom common stock to be traded at "artificially inflated" prices during the Class Period. (Id. ¶ 233) Then, "[w]hen the true facts about [SuperCom] were revealed to the market, the inflation in the price of SuperCom common stock was removed and the price of SuperCom common stock declined dramatically, causing losses to Plaintiff and the other members of the Class." (Id. ¶ 235)

### K.   SuperCom's Full Year Results for 2015 and Subsequent Statements about Recurring Revenue

On April 11, 2016, SuperCom released its full year financial results for 2015. (Id. ¶ 217) SuperCom reported revenues of $29.5 million and non-GAAP EPS of $0.48, which

meant that SuperCom fell short of even its revised projections. (Id. ¶¶ 217-218) SuperCom did confirm, however, that its "steady state revenues" had increased from under $12 million in 2014 to over $15 million in 2015. (Id. ¶ 220) Arie Trabelsi "blamed the results on 'the project-driven nature of our business, and the sometimes longer-than-expected sales cycle [SuperCom was] experiencing within the eID market.'" (Id. ¶ 219)

After announcing its financial results for 2015 on April 11, 2016, SuperCom held an earnings call. (Id. ¶ 221) During the call, Ordan Trabelsi "acknowledged that '[e]fforts to better predict the timing of these opportunities [in SuperCom's EID pipeline] ha[d] proven difficult' and so [SuperCom] would 'refrain from providing specific guidance at th[at] stage.'" (Id. ¶ 222) Ordan Trabelsi also indicated during that call that not all "steady-state revenues" were truly "recurrent": "'Steady-state revenues consist of maintenance, licensing, consumables and software and hardware upgrades, all [of] which are delivered through existent customers which are past their initial deployment phase. Some of these revenues are contracted and recurrent while other are based on consumption and use.'" (Id. ¶ 223 (emphasis omitted))

## L.     Plaintiffs' Claims

The Amended Complaint asserts claims under Section 10(b) of the Securities Exchange Act and SEC Rule 10b–5 against SuperCom, Arie Trabelsi, Tsyvia Trabelsi, Ordan Trabelsi, and Simona Green.[7] (Id. ¶¶ 247-50) It also asserts claims under Section 20(a) of the Securities Exchange Act against all individual defendants.

## II.     PROCEDURAL HISTORY

On December 9, 2015, the first of three putative securities fraud class action lawsuits was filed on behalf of stockholders in SuperCom common stock during the Class

---

[7] The Amended Complaint does not assert a Section 10(b) claim against Barak Trabelsi.

Period. (Dkt. No. 1) On August 22, 2016, this Court consolidated the three actions and appointed Lead Plaintiff and Lead Counsel. (Dkt. No. 41) The Amended Complaint was filed on October 7, 2016 (Dkt. No. 46), and Defendants filed their motion to dismiss on August 31, 2017. (Dkt. No. 59)

Defendants argue that the Section 10(b) claims should be dismissed because the challenged statements are protected under the PSLRA's safe harbor as forward-looking statements that were accompanied by meaningful cautionary language. (Def. Br. (Dkt. No. 61) at 19-23) Defendants alternatively contend that the Section 10(b) claims fail because the Amended Complaint does not plead facts supporting a strong inference of scienter. (Id. at 23-30) Defendants assert that the Section 20(a) claims should be dismissed because the Amended Complaint does not allege a primary violation of the Exchange Act. (Id. at 30)

## DISCUSSION

## I. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chetoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle N.E., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to establish entitlement to relief. Iqbal, 556 U.S. at 678.

### B.   Securities Fraud

"'A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards.'" In re Cannavest Corp. Sec. Litig., 307 F. Supp. 3d 222, 236 (S.D.N.Y. 2018) (quoting In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 383 (S.D.N.Y 2012)). "First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud.'" Id. (quoting Fed. R. Civ. P. 9(b)). This requirement "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Accordingly, a securities fraud complaint based on misstatements must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). The PSLRA requires a

plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to 'deceive, manipulate, or defraud.'") (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)). "To qualify as 'strong' within the intendment of [the PLSRA][,] . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PLSRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

## II. PLAINTIFFS' SECTION 10(B) CLAIMS

### A. Statutory Framework

#### 1. Section 10(b) of the Securities Exchange Act of 1934

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in violation of the rules set forth by the SEC for the protection of investors. 15 U.S.C. § 78j. Pursuant to SEC Rule 10b–5, promulgated thereunder, it is unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a material misstatement or omission claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at 105 (citing Lentell v. Merill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)).

### 2. The PLSRA's Safe Harbor

"The PSLRA established a statutory safe-harbor for forward-looking statements." Slayton v. Am. Exp. Co., 604 F.3d 758, 765 (2d Cir. 2010). Under the PSLRA, where a

private action . . . is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a [defendant] shall not be liable with respect to any forward-looking statement . . . if and to the extent that –

(A) the forward-looking statement is –

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement –

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was –

> (I) made by or with the approval of an executive officer of that entity; and
>
> (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).

Under the PSLRA's safe harbor provision, "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (quoting Slayton, 604 F.3d at 766) (alterations in original). "Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies." Id. (quoting Slayton, 604 F.3d at 766).

The PSLRA defines "[t]he term 'forward-looking statements'" broadly to include, inter alia, "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, . . . or other financial items," and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management . . . ." 15 U.S.C. § 78u-5(i)(1)(A), (C). Additionally, forward-looking statements include "any statement of the assumptions underlying or relating to any statement described" in the definition. 15 U.S.C. § 78u-5(i)(1)(D). "However, [a] statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements." Vivendi, 838 F.3d at 246 (internal quotation marks and citations omitted).

**B.      The First Prong of the Safe Harbor**

Defendants argue that the Section 10(b) claims are barred under the first prong of the safe harbor, because the projections in the January 2015 Outlook and SuperCom's "subsequent expressions of optimism regarding its perceived ability to meet the [p]rojections" are "forward-looking statements" that were accompanied by "meaningful cautionary language." (Def. Br. (Dkt. No. 61) at 17-19)

Plaintiffs do not dispute that the projections in the January 2015 Outlook are forward-looking statements, but contend that the Section 10(b) claims are also premised on "numerous false and misleading statements of present or historical fact" that Defendants made "with the intention of bolstering the perceived credibility of the [January] 2015 Outlook." (Pltf. Opp. (Dkt. No. 63) at 16)  According to Plaintiffs, these statements include the following: that (1) SuperCom had "'an expanding base of recurring revenue'"; (2) SuperCom was "'very close to hav[ing] a large contract awarded' in the next 90 days"; (3) "the opportunities in the pipeline were 'just amazing'"; (4) "investors 'can be . . . confident that we have all the information in hand to support these numbers'";  (5) SuperCom "was 'progressing well in large and small contracts'"; (6) SuperCom's "'pipeline of opportunities' had 'continued to grow as [SuperCom] advanced a number of important tenders during the quarter'"; (7) SuperCom "had 'dramatically broaden[ed] [its] new business pipeline'"; and (8) "'the number of advanced stage tenders in our [EID] pipeline continues to increase.'"  (Id. (quoting Am. Cmplt. (Dkt. No. 46) ¶¶ 128, 136, 138, 147, 169, 174) (alterations in original))

Plaintiffs also argue that, "as to the [January] 2015 Outlook itself, . . . Defendants' risk warnings were not 'meaningful' as necessary for safe-harbor protection." (Id. at 17)

Defendants respond that the statement regarding SuperCom's "expanding base of recurring revenue" is not actionable, because that statement was not false or misleading. (Def. Reply. (Dkt. No. 62) at 7 n.2) Defendants also contend that the other statements cited by Plaintiffs – each of which relates to the sales pipeline – are not actionable because they are (1) inseparable from the forward-looking projections; (2) puffery; (3) statements of opinion; or (4) "lack the requisite specificity needed to support a claim for misrepresentation of fact." (Def. Reply (Dkt. No. 62) at 8-9, 11 n.5)

As discussed below, the Court concludes that the statement about SuperCom's base of recurring revenue was a misleading statement that does not fall within the safe harbor. With respect to the statements about the sales pipeline, however, the Court finds that these statements are not actionable because they are inseparable from the forward-looking projections. Finally, the Court finds that Defendants' forward-looking projections were accompanied by meaningful cautionary language.

**1.    Statement Concerning SuperCom's Recurring Revenue**

The first allegedly fraudulent statement cited by Plaintiffs is Arie Trabelsi's statement in the March 26, 2015 press release that SuperCom had an "expanding base of recurring revenue." (Pltf. Opp. (Dkt. No. 63) at 16 (quoting Am. Cmplt. (Dkt. No. 46) ¶ 128)) That statement, in full context, reads as follows: "2014 was a truly transformative year for Supercom, highlighted by significant year-over-year growth, strong cash flows, and an expanding base of recurring revenue." (Pressment Decl., Ex. E (March 26, 2015 press release) (Dkt. No. 60) at 292) Defendants do not argue that this statement is forward-looking or immaterial, but they contend that it is not fraudulent. (Def. Reply (Dkt. No. 62) at 7 n.2)

Plaintiffs do not contend that this statement is actually false.[8] Plaintiffs do contend, however, that the statement is misleading, because what "Defendants described as 'recurring revenue' included revenue from follow-on contracts," which "provide neither the long-term growth potential of truly new contracts nor the predictable high margins of truly recurring revenues." (Pltf. Opp. (Dkt. No. 63) at 11 (emphasis in original); see also Am. Cmplt. (Dkt. No. 46) ¶¶ 122, 211, 223)

"A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement." Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co., No. 15 CIV. 5999 (PGG), 2017 WL 4403314, at *13 (S.D.N.Y. Sept. 30, 2017) (internal quotation marks and citation omitted). "In general[,] there is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014) (internal quotation marks and citations omitted). "[D]isclosure is required," however, "when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." Id. (internal quotation marks and citations omitted). In other words, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." Id.

Still, "[t]hat duty is not boundless." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *13 (internal quotation marks and citation omitted). "'[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject.'" (Id. (quoting Richman v. Goldman Sachs Group, Inc., 868 F.Supp.2d 261, 274 (S.D.N.Y. 2012)). "'[T]he

---

[8] To the contrary, the Amended Complaint pleads that SuperCom had approximately $12 million in recurring revenue in 2014 (Am. Cmplt. (Dkt. No. 46) ¶¶ 195, 199), which was more than its total revenue of $8.8 million in 2013. (Id. ¶ 34) Accordingly, SuperCom's recurring revenue was necessarily higher in 2014 than in 2013.

proper inquiry requires an examination of defendants' representations, taken together and in context.'" Meyer, 761 F.3d at 250-51 (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 366 (2d Cir. 2010)). "In other words, [courts] look to the total mix of available information." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *13 (internal quotation marks and citation omitted).

Accepting Plaintiffs' allegations as true, the term "'recurring revenues' implies revenue that is highly likely to continue in the future and is thus predictable, stable[,] and can be counted on in the future with a high degree of certainty." (Am. Cmplt. (Dkt. No. 46) ¶ 120) By contrast, "the revenue from a follow-on contract may not be truly recurring revenue because follow-on contracts tend to be a year or less in length and the amount and timing of follow-on orders can be unpredictable." (Id. ¶ 121 (internal citation and quotation marks omitted))

On April 11, 2016, the day that SuperCom released its full year financial results for 2015, Ordan Trabelsi stated on an earnings conference call that SuperCom's "steady-state revenues" – which Defendants concede is a term that SuperCom used "interchangeably" with "recurring' revenue[s]" (Def. Reply (Dkt. No. 62) at 7 n.2) – included revenues from follow-on contracts. (See Am. Cmplt. (Dkt. No. 46) ¶ 223 ("We continue to generate recurring revenues with existing customers and follow-on orders of the government. . . . Steady-state revenues consist of maintenance, licensing, consumables and software and hardware upgrades, all [of] which are delivered through existent customers which are past their initial deployment phase. Some of these revenues are contracted and recurrent while others are based on consumption and use.") (emphasis in original)) Read together, these allegations plausibly plead that a reasonable investor would have received a false impression from Arie Trabelsi's March 26, 2015 statement about SuperCom's base of recurring revenues. Arie Trabelsi suggested that SuperCom had a

growing base of recurring revenue that was predictable and stable, when, in fact, some of the revenue to which he referred was not truly "recurring."[9]  His statement was therefore misleading.

For these same reasons, a similar statement of present fact that was not specifically cited by Plaintiffs (see Pltf. Opp. (Dkt. No. 63) at 16) – Arie Trabelsi's statement in the September 16, 2015 press release that SuperCom had "a growing base of recurring revenues" (Pressment Decl., Ex. J (September 16, 2015 press release) (Dkt. No. 60) at 454) – was also misleading.

### 2.    Statements Concerning SuperCom's Sales Pipeline

#### a.    Mixed Present and Future Statements that are Inseparable

"Mixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present." Maverick Fund, L.D.C. v. Comverse Tech., Inc., 801 F. Supp. 2d 41, 59 (E.D.N.Y. 2011) (citing, inter alia, Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.")); see also Vivendi, 838 F.3d at 246 ("[A] statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements.") (internal quotation marks and citations omitted). "However, when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it

---

[9]  Defendants contend that the statement was not misleading, because "no nefarious conclusion arises" from Ordan Trabelsi's use of the term "steady-state revenues" rather than "recurring revenues." (Def. Reply (Dkt. No. 62) at 7 n.2)  Whether a nefarious conclusion arises bears on the issue of scienter, but not on whether the statement is misleading.

makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." Maverick Fund, 801 F. Supp. 2d at 59 (citing Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 255-56 (3d Cir. 2009) (holding that a company's statement that it was "on track" to meet a future projection did "not transform the statements, or any part of them, into non-forward-looking assertions outside of the Safe Harbor")). This is because "'[s]uch an assertion is necessarily implicit in every future projection.'" Id. (quoting Avaya, 564 F.3d at 255); see also Gissin v. Endres, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'") (quoting Avaya, 564 F.3d at 255).

Here, one of the present tense statements cited by Plaintiffs cannot be meaningfully distinguished from the forward-looking projections: Arie Trabelsi's statement during the March 26, 2015 earnings call that, "[w]hen we say we believe that we [will] have [a] great year[] [in] 201[5], [with] over 42 million of revenue and $1.2 EPS, you can be [] confident that we have all the information in hand to support these numbers we believe [for] revenue and margin." (Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 313) The present tense portion of that statement – that Defendants had "all the information in hand to support these numbers" – does not provide any specific information about SuperCom's current circumstances. Accordingly, it is "too vague to be actionable apart from the future projection[s]."[10] Maverick Fund, 801 F. Supp. 2d at 59; see also Golesorkhi v. Green Mountain

---

[10] Vivendi, 838 F.3d 223, is not to the contrary. There, the Second Circuit stated that "forward-looking elements may be severable from non-forward-looking elements," and held that there was "nothing prospective about the representation[s] that Vivendi entered 2001 with a very strong

<u>Coffee Roasters, Inc.</u>, 973 F. Supp. 2d 541, 554 (D. Vt. 2013) ("Blanford's comments in the

Press Release . . . are in substance an affirmation of the projections the Company issued at the

start of the fiscal year. . . . , and therefore fall squarely within the definition of forward-looking

statements under the PSLRA."), <u>aff'd</u>, 569 F. App'x 43 (2d Cir. 2014).

### b.  Statements of Puffery

It is well-settled that

> "[E]xpressions of puffery and corporate optimism do not give rise to securities
> violations.  Up to a point, companies must be permitted to operate with a hopeful
> outlook:  People in charge of an enterprise are not required to take a gloomy,
> fearful or defeatist view of the future; subject to what current data indicates, they
> can be expected to be confident about their stewardship and the prospects of the
> business that they manage."

<u>Nguyen v. New Link Genetics Corp.</u>, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018) (quoting

<u>Rombach</u>, 355 F.3d at 174).  "On the other hand, pollyannaish statements couched as rosy

corporate-speak may be actionable if they contradict facts known to a defendant," <u>id.</u>, "if they are

worded as guarantees or are supported by specific statements of fact, or if the speaker does not

genuinely or reasonably believe them."  <u>IBEW Local Union No. 58 Pension Tr. Fund & Annuity</u>

<u>Fund v. Royal Bank of Scotland Grp., PLC</u>, 783 F.3d 383, 392 (2d Cir. 2015) (internal quotation

marks and citations omitted).  Although there is no definitive test to determine how vague a

statement must be to qualify as puffery, "statements expressing a general view that 'things are

---

balance sheet," "very strong 2000 results," and an "achievement of aggressive incremental
EBITDA targets."  <u>Vivendi</u>, 838 F.3d at 246 (internal quotation marks and citations omitted)
(emphasis added).  Those statements, which made specific representations about Vivendi's
historical financial performance, are clearly distinguishable from Arie Trabelsi's vague
representation that SuperCom had "information in hand to support" its projections.  (Pressment
Decl., Ex. F (March 26, 2015 Earnings Call) (Dkt. No. 60) at 313)  Nor is this statement like the
one at issue in <u>Tellabs</u>, 513 F.3d 702, where the Seventh Circuit held that the safe harbor did not
protect a representation that sales of a particular product were "still going strong."  <u>Id.</u> at 705.

going well,' that the company is 'well positioned,' or that a year was 'successful' are generally not actionable." In re Nevsun Res. Ltd., No. 12 CIV. 1845 PGG, 2013 WL 6017402, at *10 (S.D.N.Y. Sept. 27, 2013).

Here, two of the present tense statements cited by Plaintiffs are inactionable puffery. Arie Trabelsi's description of the opportunities in the sales pipeline as "just amazing," and Ordan Trabelsi's remark that SuperCom was "progressing well in large and small contracts" are too general to cause a reasonable investor to rely upon them. See Billhofer v. Flamel Techs., S.A., No. 07 CIV. 9920 (RWS), 2012 WL 3079186, at *9 (S.D.N.Y. July 30, 2012) ("The phrase 'moving forward well' conveys no meaningful, objective data that an investor would rely upon. It is simply an assertion that courts have found to be immaterial."); In re GPC Biotech AG Sec. Litig., No. 07–06728 (DC), 2009 WL 5125130, at *4-5 (S.D.N.Y. Dec. 29, 2009) (statement that clinical "trial was going well" was immaterial puffery); Pollio v. MF Global, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) (statement that "the franchise is performing well" was optimistic puffery).

Moreover, neither of these statements was "worded as [a] guarantee[], and Plaintiffs have alleged no concrete evidence to suggest that Defendants did not subjectively believe that" these statements were true. In re Rockwell Med., Inc. Sec. Litig., No. 16 CIV. 1691 (RJS), 2018 WL 1725553, at *8 (S.D.N.Y. Mar. 30, 2018). The Amended Complaint only alleges in a conclusory manner that SuperCom "was not 'progressing well in large and small contracts.'" (Am. Cmplt. (Dkt. No. 46) ¶ 139) Accordingly, these statements are not actionable.

### c. **Statements of Opinion**

"Statements that 'express expectations about the future rather than presently existing, objective facts' are [] statements of opinion." In re Aratana Therapeutics Inc. Sec.

Litig., No. 17 CIV. 880 (PAE), 2018 WL 2943743, at *15 (S.D.N.Y. June 11, 2018) (quoting

Fialkov v. Alcobra Ltd., No. 14 CIV. 09906 (GBD), 2016 WL 1276455, at *6 (S.D.N.Y. Mar.

30, 2016)). "Such statements, often marked by phrases such as 'I believe,' are inactionable so

long as the speaker actually held the belief professed, did not supply an untrue supporting fact,

and did not omit information rendering the statement misleading." Id. (citing Omnicare, Inc. v.

Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1332 (2015)).

To adequately allege that a statement of opinion was misleading through the

omission of material information,

> "[t]he investor must identify particular (and material) facts going to the basis for
> the issuer's opinion – facts about the inquiry the issuer did or did not conduct or
> the knowledge it did or did not have – whose omission makes the opinion
> statement at issue misleading to a reasonable person reading the statement fairly
> and in context."

Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (quoting Omnicare, 135 S. Ct. at 1332). The

Supreme Court has emphasized, however, that establishing liability on such a theory "'is no

small task.'" Id. (quoting Omnicare, 135 S. Ct. at 1332). "'[R]easonable investors understand

that opinions sometimes rest on a weighing of competing facts'"; therefore, "a statement of

opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact

cutting the other way.'" Id. at 210 (quoting Omnicare, 135 S. Ct. at 1329). Additionally, "'an

omission that renders misleading a statement of opinion when viewed in a vacuum may not do so

once that statement is considered, as is appropriate, in a broader frame.'" Id. (quoting Omnicare,

135 S. Ct. at 1330). "The core inquiry is whether the omitted facts would 'conflict with what a

reasonable investor would take from the statement itself.'" Id. (quoting Omnicare, 135 S. Ct. at

1329).

Here, one of the statements cited by Plaintiffs is an inactionable opinion. Arie Trabelsi's statement during the March 26, 2015 earnings call that SuperCom was "very close to hav[ing] a large contract awarded" (Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 313), considered in its full context, clearly constitutes a statement of opinion, because it is an "expectation[] about the future rather than presently existing, objective facts," accompanied by the words "we believe." Aratana Therapeutics, 2018 WL 2943743, at *15 (internal quotation marks and citations omitted). Arie Trabelsi stated:

> We [we]re very close to hav[ing] a large contract awarded in November [or] December, which we believe was just a delay, and we believe that [we] should be [] confident in the user in just 90 days.

(Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 313) Because this statement is a statement of opinion, it is not actionable unless the Amended Complaint also alleges that Arie Trabelsi did not actually hold that belief, supplied an untrue supporting fact, or omitted information rendering the statement misleading. Omnicare, 135 S. Ct. at 1332. The Amended Complaint contains no such allegations. (See Am. Cmplt. (Dkt. No. 46) ¶¶ 136-139) Accordingly, this statement is not actionable.

### d.     Statements Pled with Insufficient Particularity

Defendants contend that the remaining three statements about the sales pipeline cited by Plaintiffs – that SuperCom's "pipeline had 'continued to grow'; that the Company had 'dramatically broaden[ed] [its] new business pipeline'; [and] that 'the number of advanced stage tenders in our [EID] pipeline continues to increase'" – are not actionable, because they "lack the requisite specificity needed to support a claim for misrepresentation of fact." (Def. Reply (Dkt. No. 62) at 8) Defendants also contend that these statements are not actionable because

"Plaintiff[s] do[] not allege with any particularity that any of these statements were actually false." (Id.)

The first statement is from SuperCom's June 1, 2015 press release: "We are increasingly excited about our pipeline of opportunities, which continued to grow as we advanced a number of important tenders during the [first] quarter [of 2015]." (Pressment Decl., Ex. G (June 1, 2015 press release) (Dkt. No. 60) at 337)

In the second statement is from SuperCom's September 16, 2015 press release:

> We executed according to plan in the second quarter, achieving revenue growth and strong margins while dramatically broadening our new business pipeline and solution offerings in our fast growing target markets. . . . The number, quality, stage and size of opportunities in our pipeline are increasingly encouraging. Based on the number of open proposals we have around the globe in various stages . . . , we believe we are well positioned to win additional new contracts this year.

(Pressment Decl., Ex. J (September 16, 2015 press release) (Dkt. No. 60) at 454)

The third statement is from SuperCom's September 16, 2015 earnings call:

> [T]he number of advanced stage tenders in our pipeline [for our EID division] continues to increase and we are in negotiations with several potential customers for contracts where we have been selected as the bidder of choice. Some of these potential contracts are significantly larger than what we've seen in the past and require more working capital.

(Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 466)

These statements are not so vague as to be inactionable, and they do not qualify as forward-looking, because they "provide[] a concrete description of the past and present state of [SuperCom's] pipeline" and suggest that the "number and type of prospective sales in the pipeline was . . . growing[] compared to previous quarters." In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1144 (9th Cir. 2017) (holding that defendants statements were not generic statements of optimism where they represented that the company's sales pipeline was "very

46

robust," "deep," "build[ing] to record levels," and "keeps growing," and that such statements were not forward-looking, because they "provided a concrete description of the past and present state of the pipeline" and "reassured investors during the class period that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters"). Nonetheless, these statements are not actionable, because Plaintiffs have not pled with particularity how these statements were fraudulent.

  "[P]laintiffs asserting claims under [Section 10(b) and] Rule 10b-5 'must do more than say than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'" <u>Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC</u>, 750 F.3d 227, 236 (2d Cir. 2014) (quoting <u>Rombach</u>, 355 F.3d at 174). Here, the Amended Complaint alleges generally that the statements about SuperCom's pipeline were false and misleading, because SuperCom's "database for tracking sales leads was [] utterly deficient," and "included many leads that [] were not plausible and that had not been updated for months." (Am. Cmplt. (Dkt. No. 46) ¶ 229) With respect to the plausibility of leads, Confidential Witness 2 states that "'95 percent of the leads coming in . . . were not real leads,'" and that "SuperCom chased 'every tender worldwide,' ranging from $50,000 to several million dollars, with no clear strategy." (<u>Id.</u> ¶¶ 104-05) Confidential Witness 3 asserts that "the [Geographical Information Sales] department submitted tens of leads to the pipeline," many of which "SuperCom had 'no chance' at [closing], and he could recall only one contract (worth $750,000) that it had a strong chance of closing." (<u>Id.</u> ¶ 106) With respect to the spreadsheet used to track leads, the Amended Complaint alleges that SuperCom's "sales staff could [] add tenders to the sales pipeline without doing much work to determine if SuperCom could legitimately obtain and service them," because "[t]hey simply had to list the name of the tender, the customer, a description of the job,

the products to be delivered, and the value." (Id. ¶ 107)  The Amended Complaint also alleges that "potential leads were not removed from the sales pipeline unless the underlying tender or project had been cancelled or given to a competitor." (Id. ¶ 108)

None of these allegations demonstrates with specificity how the three statements at issue were false or misleading.  Allegations that only 5 percent of SuperCom's leads were "real leads," that SuperCom chased "'every tender worldwide,'" and that SuperCom had a "strong chance of closing" only one of the leads submitted by the Geographical Information Sales department do not show that SuperCom did not, in fact, "advance a number of important tenders during the [first] quarter."[11]  (Pressment Decl., Ex. G (June 1, 2015 press release) (Dkt. No. 60) at 337)  SuperCom's advancement of multiple important tenders is entirely consistent with each of those allegations.  Likewise, Plaintiffs' allegations do not demonstrate that the "number of advanced stage tenders in [SuperCom]'s pipeline [for its EID division]" did not "continue to increase" in the second quarter. (Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 466)  Indeed, the confidential witnesses' comments on SuperCom's allegedly "deficient" sales database say nothing at all about advanced stage tenders or the EID division specifically.  Finally, with respect to Arie Trabelsi's statement that SuperCom had "broaden[ed] [its] new business pipeline" during the second quarter, the Amended Complaint does not allege how many leads were included in SuperCom's pipeline during the first quarter, or provide any other basis for determining whether SuperCom, in fact, broadened its pipeline.

---

[11]  In fact, Confidential Witness 2, who stated that only 5 percent of SuperCom's leads were "'real leads,'" and that SuperCom chased "'every tender worldwide,'" was not even employed by SuperCom until August 2015 – two months after the June 1, 2015 statement was made. (Am. Cmplt. (Dkt. No. 46) ¶ 104)

To the extent that Plaintiffs argue that the three statements at issue were misleading because leads were not removed from SuperCom's pipeline until the tender or project had been cancelled or awarded to a competitor (see Am. Cmplt. (Dkt. No. 46) ¶ 108), that argument lacks merit. Defendants' alleged retention of sales opportunities in their database until they are no longer viable opportunities is consistent with their repeated characterization of SuperCom's pipeline as a "pipeline of opportunities" (id. ¶¶ 56, 147; see also, e.g., Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 306 ("We continue to be encouraged by the number, quality and size of opportunities we have in our sales pipeline[.]")), and a statement is not misleading unless it would give a "reasonable investor, in the exercise of due care, . . a false impression." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *13 (internal quotation marks and citations omitted).

Plaintiffs' failure to plead with specificity how Defendants' statements about the sales pipeline are fraudulent distinguishes this case from Quality Sys., 865 F.3d 1130, on which Plaintiffs rely. (See Pltf. Opp. (Dkt. No. 63) at 17) In Quality Sys., plaintiffs adequately alleged that defendants' non-forward-looking statements about their sales pipeline were false or misleading through confidential witnesses, who stated, inter alia, that (1) defendants had "explained in internal [] conference calls . . . that the market for [their products] 'had become saturated'"; (2) defendants had experienced "a slowdown [in] business"; and (3) "the bonus portion of [a confidential witness's] compensation, which was based on [defendants'] sales figures, had been eliminated." Quality Sys., 865 F.3d at 1144. Plaintiffs in Quality Sys. also alleged that a member of defendants' board of directors stated that the "sales pipeline had been declining," and that a senior sales executive stated that, in his region, "sales executives were

falling short 'often by more than 50%[,]' and that [he] 'believed other regions were similarly missing their targets by about 50%.'" Id. Plaintiffs have alleged no such facts here.

In sum, the Court finds that the statements regarding SuperCom's sales pipeline are not actionable separately from the forward-looking projections. Even if they were separately actionable, Plaintiffs' Section 10(b) claims would still fail because – as discussed below – Plaintiffs have inadequately pled scienter.

### 3. Meaningful Cautionary Language

"The safe harbor protects forward-looking statements that are 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" Slayton, 604 F.3d at 770 (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). "'To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information.'" Vivendi, 838 F.3d at 247 (quoting Slayton, 604 F.3d at 772). Additionally, "[t]he cautionary language must be 'extensive and specific' and 'tailored to the specific future projections, estimates, or opinions' in the statements that plaintiffs challenge." Bettis v. Aixtron SE, No. 16 CIV. 00025 (CM), 2016 WL 7468194, at *13 (S.D.N.Y. Dec. 20, 2016) (quoting Slayton, 604 F.3d at 772). "'Vague' disclaimers are inadequate." Vivendi, 838 F.3d at 247 (quoting Slayton, 604 F.3d at 772).

At the same time, "a defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor." Slayton, 604 F.3d at 773. To be meaningful, cautionary language need only "identif[y] with specificity the types of risks that might lead [] estimates to be inaccurate." In re Barrick Gold Sec. Litig., No. 13 CIV. 3851 SAS, 2015 WL

50

1514597, at *8 (S.D.N.Y. Apr. 1, 2015); see also In re IAC/InterActiveCorp Sec. Litig., 478 F.

Supp. 2d 574, 586 (S.D.N.Y. 2007) ("[A] projection may benefit from the PSLRA safe harbor

for forward-looking statements so long as defendants also 'point[ed] to the principal

contingencies that could cause actual results to depart from the projection.'") (quoting Asher v.

Baxter Int'l Inc., 377 F.3d 727, 734 (7th Cir. 2004)).

      Where, as here, Defendants' press releases and earnings calls refer to corporate

filings containing cautionary statements,[12] the statements in the press releases and earnings calls

may qualify for protection under the safe harbor based on the contents of the corporate filings.

See In re Avon Prods., Inc. Sec. Litig., No. 05 Civ. 6803 (LAK) (MHD), 2009 WL 848017, at

*18 (S.D.N.Y. Feb. 23, 2009) ("[O]ral statements . . . will come within the safe harbor provision

if cautionary language is found in a 'readily available written document,' 15 U.S.C. § 78u–

5(c)(2), [such as] 'SEC filed documents, annual reports and other widely disseminated materials,

such as press releases,' H.R. Rep. 104–369, at 45 (1995) (Conf.Rep.)."); Fort Worth Employers'

Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 232-33 (S.D.N.Y. 2009) (holding that forward-

looking statements made during conference calls with analysts were protected under the first

prong of the safe harbor because, during these calls, a corporate representative referred investors

to meaningful cautionary language included in a press release).

---

[12] As discussed above, all of the press releases and earnings calls at issue referred investors to
the risk factors set forth in SuperCom's periodic SEC filings. (See Pressment Decl., Ex. C
(January 21, 2015 press release) (Dkt. No. 60) at 285; Pressment Decl., Ex. E (March 26, 2015
press release) (Dkt. No. 60) at 294; Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt.
No. 60) at 304; Pressment Decl., Ex. G (June 1, 2015 press release) (Dkt. No. 60) at 338;
Pressment Decl., Ex. H (June 1, 2015 earnings call) (Dkt. No. 60) at 344; Pressment Decl., Ex. J
(September 16, 2015 press release) (Dkt. No. 60) at 455; Pressment Decl., Ex. K (September 16,
2015 earnings call) at 463)

Here, not only do Defendants' periodic filings with the SEC identify with specificity several risks that might lead the projections to be inaccurate (see Pressment Decl., Ex. B (2013 Fiscal Year Report) (Dkt. No. 60) at 88-101), they acknowledged the very risks that the Amended Complaint blames for investors' losses: delayed government contracts, lengthy sales cycles, and unpredictable revenues from non-recurring sources. With respect to government contracts, Defendants warn that

> [g]overnmental [c]ontracts subject [SuperCom] to risks associated with public budgetary restrictions and uncertainties, actual contracts that are less than awarded contract amounts, and cancellation at any time at the option of the governmental agency. . . . Furthermore, governmental programs can experience delays or cancellation of funding, which can be unpredictable.

(Id. at 91)

With respect to sales cycles, Defendants warn that, "our result[s] may fluctuate from year to year" due to "long customer sales cycles" (id. at 94) and that,

> [t]he period between [SuperCom's] initial contact with a potential customer and the purchase of [SuperCom's] products and services is often long and subject to delays associated with [] budgeting, approval and competitive evaluation processes . . . . The typical sales cycle for our government customers has, to date, ranged from nine to 24 months[,] and the typical sales cycle for our commercial customers has ranged from one to six months.

(Id. at 95)

With respect to the Company's revenues, Defendants warn that Supercom's

> financial and operating results have fluctuated in the past and could fluctuate in the future from quarter to quarter. As a result of our dependence on a limited number of customers and our increased reliance on our e-ID, electronic monitoring PureRF suite and products, our revenue has experienced wide fluctuations, and we expect that our revenue will continue to fluctuate in the future as we integrate the operations of the SmartID Division. A portion of our sales is not recurring sales; therefore, quarterly and annual sales levels will likely fluctuate. Sales in any period may not be indicative of sales in future periods.

(Id. at 94 (emphasis added))

Because these cautionary statements "did more than refer to the most general of economic risks," and "pointed to the principal contingencies that could cause actual results to depart from the projection[s]," they "effectively secure[] the protection of safe harbor for [Defendants'] forward-looking statements."[13] Gissin, 739 F. Supp. 2d at 509, 511 (internal quotation marks and citations omitted).

Even if Defendants' cautionary statements were not meaningful, the forward-looking statements would be protected under the third prong of the PSLRA's safe harbor, for the reasons discussed below.

---

[13] To the extent Plaintiffs argue that Defendants' cautionary statements are not meaningful because Defendants assured investors that, while "quarterly revenue might be lumpy, annual revenue remained predictable" (Pltf. Opp. (Dkt. No. 63) at 18 (emphasis in original)), that argument lacks merit. As reflected above, Defendants' SEC filings warn that "quarterly and annual sales levels will likely fluctuate," and that "result[s] may fluctuate from year to year" for many reasons, including "long customer sales cycles," and "the lack of government funds appropriated to purchasing [SuperCom]'s products and services." (Pressment Decl., Ex. B (2013 Fiscal Year Report) (Dkt. No. 60) at 94)

Plaintiffs also appear to contend that Defendants' cautionary statements are not meaningful because Defendants allegedly "insisted repeatedly throughout 2015 that the [January] 2015 Outlook was based solely on . . . deployment revenues from contracts that had already been signed," when, in fact, Defendants' projects "depended . . . on the assumption that [SuperCom] would sign new contracts." (Am. Cmplt. (Dkt. No. 46) ¶¶ 101-02; see also id. ¶ 231 ("$10 million of the expected revenue for the third quarter of 2015 was related to a contract that had not been signed as of November 30, 2015. . . ."); Pltf. Opp. (Dkt. No. 63) at 19) Defendants did not advise investors that the January 2015 Outlook consisted solely of expected revenues from contracts that had already been executed, however. To the contrary, Defendants repeatedly disclosed that SuperCom did not wait until a contract has been executed before announcing expected revenue. (See, e.g., Pressment Decl., Ex. H (June 1, 2015 earnings call) (Dkt. No. 60) at 346 ("As a general practice we announce new wins once a new contract is signed and/or a significant milestone achieved grants us high confidence in future revenues."); Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 478 ("[SuperCom's] general methodology is to announce the contracts once they're signed or another – very high confidence makes us believe that the projects will start."); id. at 484 (stating that the January 2015 Outlook was based in part on a "new contract" worth over $15 million, for which SuperCom had been "selected as the bidder of choice," but which had not been signed))

## C.    Scienter

### 1.    Group Pleading

As an initial matter, Defendants contend that "the Amended Complaint impermissibly attempts to plead scienter through group pleading by repeatedly lodging allegations against 'Defendants' as a whole rather than as to each Defendant individually." (Def. Br. (Dkt. No. 61) at 24)

"'Scienter must be separately pled and individually supportable as to each defendant," and "is not amenable to group pleading.'" Kinra v. Chicago Bridge & Iron Co., No. 17 CIV. 4251 (LGS), 2018 WL 2371030, at *6 (S.D.N.Y. May 24, 2018) (quoting C.D.T.S. v. UBS AG, No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013)); see also S.E.C. v. Espuelas, 579 F. Supp. 2d 461, 482 n.10 (S.D.N.Y. 2008) ("[T]he group pleading doctrine can only be invoked to attribute fraudulent statements to defendants, remaining wholly insufficient to plead scienter.").

Here, the Amended Complaint includes individualized allegations of scienter only as to Ordan Trabelsi and Arie Trabelsi.  (See Am. Cmplt. (Dkt. No. 46) ¶ 109 ("Arie Trabelsi was well aware of the status of the Company's pipeline.  According to Confidential Witness 3, each department submitted a weekly spreadsheet to him listing all potential sales leads and then presented them at a weekly sales meeting."); id. ¶ 116 ("Arie Trabelsi was fully aware of SuperCom's inability to make timely deliveries because he received daily reports from the research and development team."); id. ¶ 153 ("Ordan Trabelsi was aware of SuperCom's inability to forecast revenues due to the deficiencies in its forecasting process."); id. ¶ 158 ("Defendant Arie Trabelsi was aware of SuperCom's inability to forecast revenues due to the deficiencies in its forecasting process."); id. ¶¶ 149, 227-232 (alleging scienter as to all

Defendants indiscriminately)) Accordingly, the Section 10(b) claims against Simona Green and Tsyviya Trabelsi must be dismissed for failure to plead scienter individually as to them.

## 2. **Statements of Past or Present Fact**

Defendants next contend that Plaintiffs have failed to adequately plead scienter in connection with any allegedly fraudulent statement of past or present fact. (See Def. Br. (Dkt. No. 61) at 25-30)

To plead scienter for a fraudulent statement of past or present fact, the PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); Slayton, 604 F.3d at 766. "Under this heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Slayton, 604 F.3d at 766 (quoting Tellabs, 551 U.S. at 324). "In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation"; rather, "the facts alleged must be 'taken collectively.'" Id. (quoting Tellabs, 551 U.S. at 322-23).

"The plaintiff may satisfy [this pleading] requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. "[I]f Plaintiffs cannot make [a] 'motive' showing, then they [can] raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." ECA v. JP Morgan Chase, 553 F.3d 187, 198-99 (2d Cir. 2009) (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).

### a.   <u>Motive and Opportunity to Commit Fraud</u>

Here, Plaintiffs' allegations are insufficient to establish that any Defendant had

the motive and opportunity to commit fraud.[14]  "Motive to commit fraud entails 'concrete

benefits that could be realized by one or more of the false statements and wrongful

nondisclosures alleged.'"  <u>Cannavest</u>, 307 F. Supp. 3d at 244 (quoting <u>Novak v. Kasaks</u>, 216

F.3d 300, 307 (2d Cir. 2000)).  In alleging motive, "[a] plaintiff may not rely on 'motives

possessed by virtually all corporate insiders,' . . . [and] instead must allege 'that defendants

benefitted in some concrete and personal way from the purported fraud.'"  <u>Id.</u> (quoting <u>Novak</u>,

216 F.3d at 307-08).  Generic motives, such as "'the desire for the corporation to appear

profitable,' as well as 'the desire to keep stock prices high to increase officer compensation,' are

'insufficient[.]'"  <u>Id.</u> (quoting <u>Kalnit</u>, 264 F.3d at 139).

The Amended Complaint does not allege that any Defendant sold SuperCom

stock at an inflated price during the Class Period, received performance-based incentives, or

otherwise had a specific motive to commit fraud.  To the extent that the Amended Complaint

alleges motive based on the June 2015 stock offering, which was completed at allegedly inflated

prices during the Class Period (Am. Cmplt. (Dkt. No. 46) ¶¶ 162-167), that generalized corporate

benefit is insufficient to establish motive.  <u>See</u> <u>City of Austin Police Ret. Sys. v. Kinross Gold</u>

<u>Corp.</u>, 957 F. Supp. 2d 277, 295 (S.D.N.Y. 2013) ("[A] 'company's desire to maintain a high

bond or credit rating' in order to 'maximize the marketability' of a debt offering [is not] a

sufficient motive for fraud.") (quoting <u>San Leandro Emergency Med. Grp. Profit Sharing Plan v.</u>

<u>Philip Morris Cos., Inc.</u>, 75 F.3d 801, 813-14 (2d Cir. 1996)); <u>In re PXRE Grp., Ltd., Sec. Litig.</u>,

---

[14]  Plaintiffs do not even attempt to argue that any Defendant had the motive and opportunity to commit fraud.  (Pltf. Opp. (Dkt. No. 63) at 19-22)

600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) ("The alleged motivation of a corporation to raise money to prevent the negative ramifications of a [] drop of a . . . stock price – even if such a drop would allegedly threaten the 'survival' of a company – is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit.")).

In sum, Plaintiffs have not pled facts demonstrating that any Defendant had a motive to commit fraud. Accordingly, for Plaintiffs to establish scienter through conscious misbehavior or recklessness, "the strength of [Plaintiffs'] circumstantial allegations must be [] greater." Kalnit, 264 F.3d at 142.

### b. Conscious Behavior or Recklessness

To survive dismissal under the conscious misbehavior or recklessness theory, Plaintiffs must allege conduct that is, "at the least . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit, 264 F.3d at 142 (internal quotation marks and citation omitted). "Although this is a highly fact-based inquiry, . . . '[s]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.'"[15] Id. (quoting Novak, 216 F.3d at 308).

### (1) Awareness of the Sales Pipeline's Alleged Deficiencies

Plaintiffs contend that, "as to [Defendants'] non-forward-looking statements, the [Amended] Complaint supports a strong inference of scienter," because "Defendants had full

---

[15] A plaintiff may also establish scienter by pleading facts demonstrating that a defendant "engaged in deliberately illegal behavior" or "failed to check information they had a duty to monitor," ECA, 553 F.3d at 199 (internal quotation marks and citation omitted), but Plaintiffs do not rely on either of these theories. (See Pltf. Opp. (Dkt. No. 63) at 19-22; Am. Cmplt. (Dkt. No. 46) ¶¶ 227-232)

access to the true facts" regarding SuperCom's allegedly deficient sales pipeline. (Pltf. Opp. (Dkt. No. 63) at 20)

As an initial matter, this argument has no force as to Ordan Trabelsi, because the only individualized allegation of his scienter is entirely conclusory. Indeed, the Amended Complaint alleges only that Ordan Trabelsi "was aware of SuperCom's inability to forecast revenues due to the deficiencies in its forecasting process" (Am. Cmplt. (Dkt. No. 46) ¶ 153), and includes no particularized allegations of how he learned of such deficiencies. Thus, Plaintiffs' claim that Ordan Trabelsi was aware of these deficiencies is premised solely on his position as President of SuperCom of the Americas. "Courts in this Circuit have long held," however, "that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." City of Brockton Ret. Sys. v. Avon Prod., Inc., No. 11 CIV. 4665 PGG, 2014 WL 4832321, at *19 (S.D.N.Y. Sept. 29, 2014) (internal quotation marks and citations omitted); see also Lipow v. Net1 UEPS Techs., Inc., 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) ("[T]o establish an inference of scienter, Plaintiff must do more than allege that [an] Individual Defendant[] had or should have had knowledge of certain facts contrary to their public statements simply by virtue of [his] high-level position."). Accordingly, the conclusory allegation that Ordan Trabelsi knew of issues with SuperCom's sales pipeline does not create an inference of scienter.[16]

---

[16] Another flaw in this theory of scienter lies in Plaintiffs' failure to allege with particularity how SuperCom's sales pipeline rendered its revenue forecasting unreliable. The Amended Complaint simply complains about the manner in which SuperCom organized and maintained its database of leads (Am. Cmplt. (Dkt. No. 46) ¶¶ 104-11), and then baldly asserts that SuperCom had an ineffective revenue forecasting process. (Id. ¶ 103) The Amended Complaint does not allege facts concerning the defects in SuperCom's revenue forecasting process, however.

As to Arie Trabelsi, the Amended Complaint does not establish that he had "knowledge of facts or access to information contradicting [his] public statements" about the sales pipeline. Kalnit, 264 F.3d at 142. Plaintiffs' theory is that Arie Trabelsi's statements regarding the strength of SuperCom's sales pipeline were reckless because he was allegedly "updated immediately if something was going wrong with a potential lead" and "received a weekly spreadsheet listing all potential sales leads."[17] (Pltf. Opp. (Dkt. No. 63) at 20; see also Am. Cmplt. (Dkt. No. 46) ¶¶ 109, 111) As discussed above, however, none of the statements from the confidential witnesses about the sales pipeline contradicts Arie Trabelsi's public statements about the sales pipeline. Accordingly, no inference of recklessness arises from the confidential witnesses' statements. See Novak, 216 F.3d at 309 ("Where plaintiffs contend [that] defendants had access to contrary facts, they must specifically identify the reports or statements containing th[e] [contrary] information.").

### (2) Changes in "Recurring Revenue" Lexicon

Plaintiffs also appear to argue that an inference of scienter arises from Defendants' use of the term "steady-state revenues," rather than "recurring revenues," after SuperCom received the SEC's September 30, 2015 letter demanding that it provide additional details regarding its sources of revenue. (See Pltf. Opp. (Dkt. No. 63) at 14 ("[I]t became clear that Defendants had such little visibility into [SuperCom's] 'recurring revenue' . . . that Defendants stopped referring to the whole category as 'recurring,'" and "[instead] [] started

---

[17] Plaintiffs also suggest that an inference of recklessness arises from Arie Trabelsi's alleged receipt of "daily reports from the research and development team[,] which informed him of SuperCom's inability to make timely deliveries to customers." (Pltf. Opp. (Dkt. No. 63) at 20-21 (citing Am. Cmplt. (Dkt. No. 46) ¶¶ 109-17)) There is no allegation in the Amended Complaint that SuperCom's failure to make a timely delivery had any effect on its revenues in 2015, however. Accordingly, Plaintiffs' allegations about delayed deliveries are irrelevant.

calling it revenue 'from steady-state customers.'")) Defendants used both terms interchangeably both before and after September 2015, however. (See, e.g., Pressment Decl., Ex. F (March 26, 2015 earnings call) (Dkt. No. 60) at 306 (Ordan Trabelsi stating that, "over the next nine to 15 months we will recognize the vast majority of the contract balance before getting into the steady state of current revenues," and that, "margins during the implementation [and deployment phase] tend to be . . . slightly lower than the margin of our recurring business [that] has already reached a steady state"); id. at 324 (Ordan Trabelsi discussing how long it takes for a deployment to return "recurring steady state" revenue); Pressment Decl., Ex. H (June 1, 2015 earnings call) (Dkt. No. 60) at 347 (Ordan Trabelsi stating that, "gross margins of our recurrent business that has already reached a steady state can be significantly higher than those during the implementation phase"); Pressment Decl., Ex. K (September 16, 2015 earnings call) (Dkt. No. 60) at 479-80 (Ordan Trabelsi stating that SuperCom "was able to stay at a similar level of [] recurring revenues" through fluctuations in the market because, "once you have deployed a system, you see a very steady stream"); Pressment Decl., Ex. M (November 30, 2015 earnings call) (Dkt. No. 60) at 501 (Ordan Trabelsi stating that "[w]e continue to generate recurring revenues and ongoing orders from existing customers . . . and follow-on orders from customers"); id. at 507 (Marom stating that SuperCom believed "recurring revenue [in 2016] [wa]s going to be about $20 million")) Accordingly, Defendants' use of the term "steady state" revenues after October 30, 2015 establishes, at best, a minimal inference of scienter.

### (3) Core Operations, Magnitude of the Miss, and Temporal Proximity

Plaintiffs also argue that a strong inference of scienter arises from the allegations regarding SuperCom's "core operations," the "magnitude of the miss," and the "temporal proximity" between Defendants' reiteration of the January 2015 Outlook in September 2015 and

their issuance of a revised outlook in November 2015. (Pltf. Opp. (Dkt. No. 63) at 21 (citing Am. Cmplt. (Dkt. No. 46) ¶¶ 228-31)) None of these allegations establishes more than a minimal inference of scienter, however.

Plaintiffs allege that "Defendants' scienter is [] supported by the core operations theory because of [SuperCom's] small size and because Defendants' statements concerned [SuperCom's] key revenue stream." (Pltf. Opp. (Dkt. No. 63) at 21 (citing Am. Cmplt. (Dkt. No. 46) ¶ 228)) Under the core operations theory, a court may infer "that a company and its senior executives have knowledge of information concerning the core operations of a business," such as "events affecting a significant source of income." In re Express Scripts Holding Co. Sec. Litig., No. 16 CIV. 3338 (ER), 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017) (internal quotation marks and citations omitted).

Since the enactment of the PSLRA, however, "[s]everal courts in this Circuit have expressed doubts as to the [core operations] doctrine's continuing import. . . ." Reilly v. U.S. Physical Therapy, Inc., No. 17 CIV. 2347 (NRB), 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018) (internal quotation marks omitted) (collecting cases); see also, e.g., Shemian v. Research In Motion Ltd., No. 11 Civ. 4068 (RJS), 2013 WL 1285779, at *18 (S.D.N.Y.2013) ("[T]his Court has carefully considered the continued viability of the 'core operations' inference in light of the PSLRA's heightened pleading requirement and found it lacking"); In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011) ("Based on the trajectory of 'core operations' law in this and other circuits, the Court ventures to suggest that the future of the doctrine may be tenuous. Indeed, the plain language of the PSLRA, which requires facts supporting the scienter inference to be 'state[d] with particularity,' would seem to limit the force of general allegations about core company operations.") (quoting 15 U.S.C. § 78u–4(b)(1)). "As

a result of these doubts . . . , the core operations inference may be considered as part of a court's

holistic assessment of the scienter allegations, but it is not independently sufficient to raise a

strong inference of scienter." Rockwell Med., 2018 WL 1725553, at *15 (internal quotation

marks and citations omitted); see also Express Scripts Holding, 2017 WL 3278930, at *18

("'[T]he core operations doctrine bolsters the strength of the inference of scienter when plaintiffs

have already adequately alleged facts indicating that defendants might have known their

statements were false.'") (quoting Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 595 (S.D.N.Y.

2011)).

  Plaintiffs next allege that "[t]he sheer magnitude of the miss – revenue of $30

million and non-GAAP EPS of less than $0.50, compared to the projected $42 million in revenue

and $1.20 in non-GAAP EPS – [] strongly suggests that Defendants were aware of the loss of

substantial portions of expected revenues sources." (Pltf. Opp. (Dkt. No. 63) at 21 (citing Am.

Cmpt. (Dkt. No. 46) ¶¶ 230-31)) Like Plaintiffs' core operations theory, however, "the

magnitude of a fraud, standing alone, cannot support a strong inference of scienter," In re Satyam

Computer Servs. Ltd. Sec. Litig., 915 F. Supp. 2d 450, 479 (S.D.N.Y. 2013), and "must be

presented in tandem with other circumstantial evidence to suggest scienter." In re Turquoise Hill

Res. Ltd. Sec. Litig., No. 13 CIV. 8846 LGS, 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014)

(internal quotation marks and citations omitted).

  Finally, Plaintiffs allege that the "temporal proximity" between Defendants'

reiteration of the January 2015 Outlook on September 16, 2015 and its issuance of a revised

outlook on November 30, 2015 supports a strong inference of scienter. (Am. Cmpt. (Dkt. No.

46) ¶ 232) Again, however, "courts in this district have held that temporal proximity alone does

not raise a circumstantial inference of fraud." Pearlstein v. BlackBerry Ltd., 93 F. Supp. 3d 233,

247 (S.D.N.Y. 2015) (holding that the "close temporal proximity between defendants' positive statements in August of 2013 and their recording of a sizable charge against inventory in September of 2013" was "too ephemeral a connection to raise a strong inference of scienter") (internal quotation marks and citation omitted)), aff'd sub nom. Cox v. Blackberry Ltd., 660 F. App'x 23 (2d Cir. 2016).

In sum, none of the individual scienter allegations gives rise to a strong inference of scienter.

### c. **Holistic Assessment**

Although the Court has rejected all of Plaintiffs' scienter arguments individually, it must still consider whether the allegations "give rise to a strong inference of scienter" when "taken collectively." Tellabs, 551 U.S. at 322-23. The Amended Complaint "will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324. Here, Plaintiffs have not provided any basis for this Court to conclude that Defendants had a motive to commit fraud, and Plaintiffs' allegations of conscious recklessness, even considered together, are extremely thin.

Moreover, there is a non-culpable explanation for SuperCom's failure to meet the January 2015 Outlook that is more cogent and compelling than an inference of scienter. The Amended Complaint alleges that SuperCom was unable to recognize more than $10 million in revenue that SuperCom "expected" for 2015, due to "'delays associated with foreign government process and approval.'" (Am. Cmplt. (Dkt. No. 46) ¶ 209) Without that delay, SuperCom would have met or barely missed the projections in the January 2015 Outlook. (Id. ¶ 95 (alleging that SuperCom needed $41.6 million in revenues to meet its projections); id. ¶ 218 (alleging actual

2015 revenues of $29.5 million)) Accordingly, the most reasonable inference arising from the Amended Complaint is that SuperCom failed to meet the January 2015 Outlook simply because expected business was delayed.

Because the inference that Defendants acted recklessly is less plausible than the non-culpable inference, Plaintiffs have not sufficiently alleged scienter with respect to Defendants' non-forward-looking statements. <u>Tellabs</u>, 551 U.S. at 324.

### 3. Forward-Looking Statements

The scienter requirement for forward-looking statements – actual knowledge – is "stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon of proof of knowing falsity." <u>Slayton</u>, 604 F.3d at 773 (internal quotation marks and citation omitted). Because Plaintiffs have not established scienter with respect to Defendants' non-forward-looking statements, Plaintiffs, <u>a fortiori</u>, have failed to establish scienter with respect to the forward-looking projections.

*　　*　　*　　*

For these reasons, Defendants' motion to dismiss Plaintiffs' Section 10(b) claims was granted.

## III. CONTROL PERSONAL LIABILITY

The Amended Complaint includes claims for alleged violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). A claim for control person liability under Section 20(a) is "necessarily predicated on a primary violation of securities law." <u>Rombach</u>, 355 F.3d at 177-78. Having found that Plaintiffs had not adequately pled a violation of the securities laws, the Court granted Defendants' motion to dismiss Plaintiffs' Section 20(a) claims.

## CONCLUSION

For the reasons stated above, in the September 30, 2018 Order, this Court granted

Defendants' motion to dismiss.  The Clerk of Court is directed to close this case.

Dated:  New York, New York
        October 10, 2018               SO ORDERED.

                               Paul G. Gardephe
                               United States District Judge